Arnold, &c., vs. Cov. and Cin. Bridge Co.

CASE 54—*AD QUOD DAMNUM*—MARCH 31.

# Arnold, &c., vs. Cov. and Cin. Bridge Co.

APPEAL FROM KENTON CIRCUIT COURT.

1. Although the Covington and Cincinnati Bridge Company is a private corporation, yet, as the bridge, when completed, is to be used by the public as a common highway, the Legislature had constitutional power to authorize the company to take, under proper restrictions, private property for its use. The same principle has been uniformly applied to turnpikes and railroads.

2. The provisions of the charter which require the jury to assess the *cash* value of the property to be condemned, and which allow the company, when they may wish to use the property pending an appeal from the assessment, to deposit the amount in any *specie-paying* bank in Covington to the credit of the proprietor, were intended to secure to the latter the *cash* or *specie* value of the property.

3. This interpretation does not involve the constitutionality of the "legal tender" act of Congress, which has no application to this charter or to any assessment under it.

4. The tender or deposit of depreciated paper, even it be a legal tender for an antecedent debt, was not a performance of the conditions created by the charter, and gave the company no right to the possession of the property.

5. As the owners were entitled to the ground until the assessment and payment of its value, the value at the time of the trial of the appeal was the true measure of assessment.

6. Where the property sought to be condemned had been conveyed to the separate use of a married woman, and was subject to a lien of the vendor, the judgment should have been for payment to her separate use, whenever the vendor should waive his lien.

7. Where a conveyance of land had been signed by a father to his son, and deposited with a third person as an escrow, to be delivered on conditions which had not been fulfilled, judgment should have been for payment of the value to the father.

R. RICHARDSON, for appellant, cited 7 *Dana*, 29 ; 1 *J. J. M.*, 586 ; *Const. of Ky.*, art. 13, sec. 14 ; 7 *B. M.*, 167, 534 ; 7 *Dana*, 81 ; 13 *B. M.*, 1 ; 5 *Dana*, 25.

M. M. BENTON, for appellee, cited 6 *Mon.*, 498 ; 1 *Dana*, 232 ; 4 *Met.*, 207 ; 13 *B. M.*, 31 ; *U. S. Stat. at Large, pp.* 532, 711 ; *Am. L. Reg.*, Aug., 1864, *p.* 591 ; *Same, April*, 1864.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT—JUDGE WILLIAMS DISSENTING :

The charter of the Covington and Cincinnati Bridge Company provides that it "shall have power and authority to

proceed and condemn any and all real property that may be necessary for the location and erection or convenience of its bridge, toll-house, abutments, piers, anchor pits, or approaches to said bridge, or to be in any way for the convenience of the same," by a prescribed proceeding under a writ of *ad quod damnum*, wherein a jury, on its own view and on extraneous testimony, "if necessary," shall assess "the *cash* value in damages which the proprietor or proprietors will sustain by an appropriation of the same in the manner proposed." It also provides, that "should the bridge company, or any proprietor of such property, be dissatisfied with the finding of the jury, an appeal may be taken to the circuit court of Kenton county, where the trial shall be had as in other ordinary cases. Should the bridge company wish to use the property during the pendency of an appeal, it may do so on depositing the amount of the finding in any *specie-paying* bank in Covington to the credit of the proprietor or proprietors of the property."

On the 25th of April, 1863, the company proceeded, in the mode prescribed, to condemn to its use and assess the value of three lots of ground in Covington near the bridge—one as the property of Mrs. Willis, and the other two as the property of Thomas N. Arnold, children of James G. Arnold, who, as admitted owner of all these lots, had conveyed one to his said daughter's separate use, free from the control of her husband, retaining a lien for an unpaid balance of the price, and had signed a conveyance of the other two to his said son, and deposited it with a stranger, as an escrow, to be delivered on prescribed conditions which do not appear to have been fulfilled, and, consequently, there is neither evidence nor presumption of a delivery of the deed.

The jury on the ground having assessed the value of one lot as the property of Mrs. Willis, and of the other two as the property of Thomas N. Arnold, they, and their father, James G. Arnold, appealed to the circuit court of Kenton. And, thereupon, the bridge company deposited in a non-specie-paying bank, in paper currency, the aggregate amount of the assessment, which the appellants refused to accept.

On the trial in the circuit court, nearly a year after the ap-

peal, the appellants offered to prove the value of the lots at that time of the trial; but the court restricted the assessment of value to the time of the first inquisition, and instructed the jury, at the instance of the appellee, that, if they should find that the lots are " necessary for the purposes of the bridge, they must assess the value thereof in *cash* as of the 25th of April, 1863." On that instruction, and without viewing the ground, the jury reduced the aggregate of the first assessments $1,200, and the company having tendered the amount in court in U. S. Treasury notes, the court confirmed the verdict, and ordered the payment of the paper as tendered to Mrs. Willis and to Thomas N. Arnold, in their respective portions, as assessed. This appeal by James G. Arnold, Thomas N. Arnold, and Mrs. Willis, seeks the reversal of that judgment.

*In limine* the counsel for the appellants insists that, as the company is a private corporation, the Legislature had no constitutional power to authorize it to take and apply to its own use private property, even on payment of its value, without the owner's consent. In this conclusion we cannot concur. Admitting the premise, the conclusion is neither legal nor logical; for although the company may use the bridge for its own profit, yet it must permit its use by the people for the public convenience as a common highway. As a viaduct it is an integral and useful part of a continuous line of national travel, and, for that purpose, is as much dedicated to public use as it could have been had it been, in all respects, public property and erected at public expense.

It is this object of public use and right to enjoy it that makes it a public highway, and legalizes the contested authority conferred by the charter. In the same way, railroads and turnpikes are made by private capital, directly for the profit of the contributing stockholders, but incidentally for public use and benefit. And because such highways, thus owned and constructed by private persons, are dedicated to public use and subserve the purposes of social and commercial intercourse, and thus promote the public welfare, the judiciary has uniformly maintained the constitutionality of legislative authority to all such corporations to take private property, as far as

may be essentially useful, by paying the owner the assessed value of it. But the constitution constructively requires an impartial assessment, by a judicial process, of the actual value in money, and full payment, before private property shall be appropriated to public use. Any other interpretation might frustrate the conservative aim of the great guaranty of private property against a capricious and unjust assertion of the inherent right of eminent domain. And, for affectuating this chartered security, the Legislature, knowing that any other than the metallic currency is frequently and extremely fluctuating, and that the latter is the only safe and stable representative of value, wisely required, in this company's charter, a judicial assessment of the value "*in cash*," and either a payment in cash or a deposit of the money in a "*specie-paying* bank." For these stringent requisitions we can see no other object than to secure to the owner the cash or specie value. It seems to us that, had not this been the provident purpose, the unusual requisition, peculiar to this charter, to assess *in cash*, and deposit the amount so fixed in a "*specie-paying* bank*," from which it could be drawn either in specie or its equivalent in paper, would never have been prescribed.

This literal, and, as we think, obvious interpretation, does not involve the constitutionality of the tender act passed by Congress in February, 1862. As between citizens, that enactment applies to judgments for debts or for damages on liabilities pre-existing the date of the judgment. It does not mould or affect the contract or judgment itself. And it does not, therefore, apply to the construction or the obligation of a contract, or to the interpretation or effect of a statute. And, consequently, it could, in no way, apply to an agreement by an owner of land to let this bridge company or a turnpike company have it on the precedent condition of first paying a stipulated sum in specie. Surely, in such a case, no jurist will say that the company can lawfully take the land, against the owner's will, on tendering the conventional amount in anything else than specie or of less value. Nor does that tender act apply to this charter, or to any assessment made under it. The Legislature had the undeniable power to require, if it

chose, an assessment in gold and a payment in gold as indispensable to any right in the company to use or take land without the owner's consent.   Until full performance of that precedent condition, there could be no contract nor any transition of title; and certainly an offer of the amount in depreciated paper, even if it be a legal tender for an *antecedent debt*, could not be considered performance, and could not therefore give the company any plausible pretence of right to take the land. A claim dependent on a precedent condition can never be available without performance, even if the condition be impossible.

The sole question then is, what did the Legislature mean in requiring, as a *sine qua non*, an assessment of the value in cash, and a deposit of the assessed amount in a specie-paying bank?   Having already answered that question, we will only repeat that the answer is fortified by the fact that "cash" and "specie-paying bank" seem to be peculiar to this charter, thereby indicating a peculiar purpose.   The deposit, as made, was therefore not a performance of the precedent condition as indispensably prescribed; and, on such a sham tender, the company had no right to take possession of any portion of the assessed ground.

For the same reason the judgment requiring the acceptance of such paper, at its nominal value, as full payment, was erroneous, and the more especially as the court instructed the jury to assess the damages in cash; and we must presume, therefore, that they did so in obedience to the instruction and conformably with the requisition of the charter.

And, as the company could have no right to use or take the ground until assessment and payment according to the constitution and the charter—the owners, being entitled to the ground until then, are, of course, clearly entitled to its equivalent at the time of transition; and, consequently, its value at that time should be the measure of assessment.   The circuit court, therefore, erred also in refusing to permit the appellants to prove the value at the time of the last trial.

In adjudging payment to Mrs. Willis and T. N. Arnold, the circuit court also erred.   Such a transmutation of her separate

## WINTER TERM, 1864.     377

Arnold, &c., vs. Cov. and Cin. Bridge Co.

estate into a vested right in her husband, would be unjust and unauthorized, and, moreover, her father's lien would be thereby wrongfully divested. The proper judgment would be for payment to her separate use whenever her father should waive his lien. And, as there is no proof that any title to the lots embraced in the escrow has ever passed from James G. Arnold to his son Thomas, the judgment for the assessed value of those two lots ought to have been for payment of it to James G. Arnold.

We perceive no error in not requiring the jury to view the lots. The charter does not seem to require such evidence on a trial in the circuit court, where, in many cases, it would be very inconvenient.

For the errors suggested the judgment is reversed, and the cause remanded for another trial according to the principles of this opinion.

----

JUDGE WILLIAMS, concurring in the reversal, though dissenting from the opinion of the majority of the court on one point, delivered the following opinion :

Although concurring in the reversal, I dissent on an important point for the following reasons:

Had the charter provided that, in case either party should take an appeal, and that the bridge company, in the meantime, should desire the possession of the land, that it should be entitled thereto by depositing the amount assessed by the jury with the court, or the clerk, or the sheriff, or any other named depositary, to the credit of the proprietor, it would have required precisely the same kind of currency, and the same precise amount, as it does require by the provisions of the charter designating any specie-paying bank of Covington in which the deposit may be made to the credit of the proprietor, in order to enable the bridge company to take immediate possession. Any specie-paying bank of Covington was designated by the Legislature because such were deemed safe depositaries, and not with the view, in any manner, of changing the character of the funds to be deposited; hence, when all the banks suspended specie payments, they lost the essential legal requisite

of safety, and immediate responsibility, which the law had designated, and were no longer lawful depositaries for the purposes named. But this was neither the fault nor misfortune of the proprietors. Had there been such a bank, however, when this deposit was made, it could not have been compelled to take, nor should it have taken, any currency but such as by law was a legal tender; and had it done so, it would have immediately become responsible for the amount in legal currency. As the deposit was made by the bridge company in a non-specie paying bank, which was not authorized by the charter to receive it, the deposit was not legal, and could in nowise affect the proprietor, nor confer upon the bridge company the right to take possession of the land; hence it is not necessary to decide whether United States Treasury notes, declared by an act of Congress to be legal tender, were sufficient, especially as this involves the constitutionality of said act, which question is now before this court for adjudication in other cases.

Had the charter required the jury to assess the *money value* in damages, instead of " the *cash value*," it would have been of the same precise legal import; for these are convertible terms. The law universally requires damages to be assessed in *dollars*, and juries are required to ascertain *how many dollars* are to be paid by one party to another as damages.

The whole import of these terms, " the cash value," was to exclude from the jury the right to consider value based upon deferred payments, or payments on time. The bridge company must *pay in cash;* it had not even the privilege of replevy for three months by giving bond and surety, to have the force of a judgment; it was therefore essentially just that the bridge company should have the benefit of a cash valuation—the quality, kind, or value of the currency to be paid was not intended to be included nor designated in these terms. Nothing more was intended than to limit the jury to the sole consideration of value in cash. When the jury had ascertained the " *cash value* in damages," and said how many dollars it amounted to, they had discharged their entire duty—exhausted all their legal power, and become *functus officio*. They could

not assess the value of the *dollars*, nor say in what kind of *dollars* the damages should be paid. The law adjudges what are dollars, and from its imperious judgment there is no appeal.

The whole proceeding to ascertain the "cash value" of the damages is judicial; but who is to ascertain the value of the dollars assessed by the jury? By what proceeding is this value to be ascertained? And when ascertained, is it to be of record or by parol, and how is it to be made known? Who is to appoint the umpire, tribunal, or whatever it may be called, which is to ascertain this value? Is *any* specie-paying bank of Covington in which the money may be deposited invested with this power? And if so, is its judgment to be final? And if not final, how shall the injured party have redress, or have an appeal whereby to reverse an unjust determination, whether by the bank or other tribunal, umpire, or power? By what character of evidence, what market, and at what time, is this value to be fixed? And when in some manner, to the charter and laws unknown, this value shall be ascertained, to whom is it to be made known? Or if it be replied that it is not the value of the dollars assessed by the jury which is to be ascertained, but the value of the *dollars* by *which those dollars* may be discharged, the same questions are just as pertinent.

These questions are suggestive of the inconsistency of allowing the damages ascertained to be paid in anything but currency which by law is a legal tender, and in any other amount than that fixed by the jury.

If the rule be adhered to that the damages are to be discharged only by paying the exact number of dollars fixed by the jury, in such money, or currency, as by law is declared to be a legal tender, the whole process is simple, harmonious, and reasonable. Any other construction renders the system complex, incongruous, and inconsistent. If the party to pay can discharge the damages so ascertained by anything but the lawful money of the country, or that money which the law designates as legal tender, why may he not discharge it in any marketable commodity at its market value? The ascertainment of the market value of cotton, tobacco, wheat, or pork, is frequently not as difficult or embarrassing as the ascertain-

ment of the market value of depreciated paper currency, and believed to be never more so.

If the damages can be discharged in one kind of depreciated paper currency, not a legal tender, it can be discharged in any kind of paper currency. If the damages are tendered in a currency which, by law, is a legal tender, the number of dollars assessed by the jury is all that should be tendered, or can be rightfully demanded.

Why should not the question of the value of the currency be as much a judicial question, as the question of the value of the damages? And if so, the absurdity is presented, of first ascertaining by judicial proceeding the value of the damages, and then, by another judicial proceeding, of ascertaining the value, in some currency, of the amount first assessed.

In the case of *Johnson's adm'r vs. Vickers*, at the present term (1 *Duvall's Rep.*), this court reversed the judgment below which was rendered Vickers for four hundred and twenty-two dollars "in gold or silver." On an obligation executed by Johnson May 13, 1858, promising to pay that amount "in gold or silver," this court held that at that time only gold and silver was a legal tender, and that such obligation legally meant nothing more than a payment of that many dollars, and that such had been the unbroken current of judicial determination of this court, and that such should have been the judgment; and goes on to say that "the tender act of Congress, if constitutional, cannot retro-act on the contract so as to change its legal construction and effect. It is true, that, although without that enactment Vickers could not have been required to take any other medium than gold or silver in satisfaction of a judgment for dollars simply, yet if that act be law, he might be compelled to take 'greenbacks' at par. But this is ulterior and contingent, and does not affect the construction of his contract, nor change the character of the only proper judgment on it for 'dollars.'"

It is hard to perceive why a contract provided by law, in the exercise of the undoubted right of eminent domain, whereby the property of one is to be transferred to another on the ascertainment of its value by a jury, and the payment of the amount,

Arnold, &c., vs. Cov. and Cin. Bridge Co.

shall be better guarded, made more sacred, or the subject of greater solicitude, than the express contracts between private individuals.

This decision is conclusive that the verdict of the jury simply for "dollars" was correct, and that, as this act of incorporation was enacted before treasury notes were attempted to be made a legal tender, the only legal judicial significance to be attached to the language is, that the damages should be paid in "dollars," and that the question of what kind of money the proprietor could be required to accept was an ulterior question, and depended on what might judicially be determined to be dollars. Dollars in constitutional, legal, and judicial contemplation, is that kind of money alone which by law one party may pay and the other is bound to receive. No such thing as adjudging one kind of dollars to one creditor and another kind of dollars to another creditor, compelling one man to take depreciated dollars, and compelling another to pay dollars of greater value, can constitutionally or legally exist.

Whether courts may give the value of certain kinds of coin or bullion in their judgments, by increasing the number of dollars, as they would give judgment for the value of so many bushels of wheat, or pounds of tobacco or cotton, payable at a future day, need not be decided; but whatever amount of dollars the court may adjudge can be discharged alone by paying that exact amount in such currency as may by law be a legal tender.

For these reasons, and to this extent, I dissent from the opinion of the majority of the court.