58   91.
77   87

## APPLICATION OF ST. BERNARD & ST. LAWRENCE CEMETERY ASSOCIATION.

New Haven Co., June T., 1889. ANDREWS, C. J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, Js.

It is provided by Gen. Statutes, § 2655, that no cemetery shall be located within one half-mile of any reservoir from which the inhabitants of any town, city or borough are supplied with water, unless the Superior Court shall, upon application and proper notice, find that such cemetery is of public convenience and necessity and will not be detrimental to the public health. An association of Catholics in a city applied to the Superior Court for its approval of the location of a cemetery for the use of the Catholic population of the city, which was about thirty thousand, upon land owned by the association within half a mile of such a reservoir. The court found the cemetery to be of public convenience and necessity and its location with reference to the reservoir not to be detrimental to the public health. Held that, as the association owned the land, and was not asking to take land for a public use, it had a right, apart from considerations of public health, to use the land for a private cemetery, and that the cemetery might be found to be of public convenience and necessity, within the meaning of the statute as applied to such a case, although it was not to be open to all the public, but was intended for the exclusive use of persons of the Roman Catholic faith.

[Argued June 7th—decided October 30th, 1889.]

APPLICATION to the Superior Court in New Haven County, for its approval of the location of a cemetery, under Gen. Statutes, § 2655. The court approved the location, and Burton Dickerman, the owner of an ice pond near, who had been admitted as a party respondent and had opposed the application, took an appeal from the judgment. The case is fully stated in the opinion.

*C. S. Hamilton* and *D. Callahan*, for the appellant.

*C. T. Driscoll* and *J. T. Fox*, for the appellees.

ANDREWS, C. J. The plaintiffs are the owners in fee of a tract of land in the town of New Haven which they have

set apart as a cemetery. Upon examination it was found that a part of the land was within a half-mile of a reservoir from which the inhabitants of New Haven are supplied with water. Thereupon this action was brought to the Superior Court in New Haven County, according to the provisions of section 2655 of the General Statutes. That section is as follows :—" No cemetery or place of sepulture shall hereafter be located or established within one half-mile of any reservoir from which the inhabitants of any town, city or borough are supplied with water, nor shall such reservoir be located or established within one half-mile of any cemetery or place of sepulture, unless the Superior Court of the county wherein such cemetery or place of sepulture or reservoir is located, shall upon application, and such notice as it may deem proper, find that such cemetery or place of sepulture or such reservoir, so proposed to be located, is of public convenience and necessity, and will not be detrimental to the public health."

The Superior Court for New Haven County, upon due hearing after notice, found that a cemetery located on the land of the plaintiffs would be of public convenience and necessity and that it would not be detrimental to public health. And upon a further hearing had on the motion of the present appellant that court found that the necessity extended to the particular piece of land owned by the plaintiffs.

Burton Dickerman, a citizen of New Haven, and the owner of certain lands near to the land of the plaintiffs, containing from five to seven acres, which he uses as an artificial ice pond, appeared in the Superior Court and was fully heard in opposition to the application of the plaintiffs. He now appeals to this court. There are nine reasons of appeal. The substance of all of them is contained in the fourth, that " the court erred in overruling this appellant's claim, that in order to constitute a public necessity there must be a public use, and that for this it was requisite that all persons have the same measure of right for the same measure of money."

In order to understand clearly this reason of appeal it may be well to recur to the claim made by the counsel for Mr.

Dickerman in the trial court and the finding of the court thereon, which are thus stated upon the record : "Said counsel claimed that the foregoing facts showed that the cemetery proposed to be located was one to be devoted exclusively to the use and for the benefit of the Catholic population and churches, and that as such it was not and could not be of public necessity and convenience." The facts referred to in this claim are, briefly, "that in the town of New Haven there is but one cemetery in which interments from the entire Catholic population attached to the various churches of that denomination, and now estimated at about one third of the entire population, or in round numbers at thirty thousand, and the bodies of Catholics brought from abroad, are made. Their interments probably average four or five hundred yearly. This ground, consecrated according to the rites of the Catholic Church and opened in 1853, and which appears to have been used exclusively in burials by Catholics, contains about twenty acres, and is now filled to that extent that not a single additional lot can be procured. In view of this fact and that there is no other cemetery in New Haven in which Catholics are buried, the Catholic clergy and congregations, united and through appropriate committees investigated, selected as best adapted for a place of burial the tract described in the application containing about seventy acres, purchased the same, and secured from the General Assembly the act of incorporation referred to." It is further found that "it was shown in evidence that no vote had ever been taken by the corporation, or by-law or regulation passed, affecting the question of right of burial in the proposed cemetery. It was not, however, claimed that the promoters or corporators had been actuated by any other consideration than the necessity of providing accommodations for burial to those connected with the Catholic congregations or denominated Catholics."

It is not very strongly claimed before this court but that the finding of the Superior Court, so far as it determines that the cemetery so proposed to be located will not be detrimental to the public health, is conclusive and cannot be

disturbed. It is, however, strenuously contended that, although the court has in words found that the proposed cemetery is of common convenience and necessity, the facts found in detail show as a matter of law that this is erroneous.

The appellant says the proposed cemetery is not and cannot be of common convenience and necessity, for the reason that all persons cannot for the same measure of money have the same measure of right to be buried therein, and cites as supporting this claim language found in the case of *The Evergreen Cemetery Association* v. *Beecher*, 53 Conn., 551. The words cited, when examined in the connection in which they are used in that case, do not support the appellant's argument. That was a complaint asking to take the lands of the defendant by the power of eminent domain for the purposes of a cemetery. There was a demurrer to the complaint and the question was reserved for the advice of the Court of Errors. In discussing the sufficiency of the complaint the judge who gave the opinion, after mentioning several kinds of public uses, and that although the use might be such that some persons would be excluded because of their inability to pay for it, said—" nevertheless it remains a public use so long as all persons have the same measure of right for the same measure of money," and then decided that the complaint in that case was insufficient because there was in it no averment that the land proposed to be taken was for the public use in the sense indicated. The expression used was an exceedingly happy one for the purpose then in hand. It was put forth as an illustration of what might be a public use rather than as an exhaustive definition of what all public uses must be.

If however it be admitted that the language used in that case should have the meaning put upon it by the appellant, yet his position is not much improved. The claim itself is so much wider than the finding of the court that it has no very firm basis of fact to rest upon. The plaintiffs, to be sure, are persons connected with the Catholic churches in New Haven, and while it is not claimed that they have been actuated by any other motive than a desire to provide burial

places for persons of their own denomination, it is found that there has never been any vote, regulation or by-law passed or proposed by which others than Catholics will be excluded from burial in their ground. This finding is perhaps sufficient to show that there is no error in the judgment of the Superior Court. But we prefer to go a little further. Among the uses which are undeniably public in their nature is the use of land for the burial of the dead. Burial places are indispensable, for " the safety of the living requires that the dead be buried in suitable time and place." It may be of the highest public utility that private persons set apart their lands for this use. And an enterprise by private persons, without expense to the public, and seeking not to violate any law of the land, which, near a great and rapidly growing city, proposes, to furnish burial places for one third of its inhabitants, is one that should be favored instead of being repressed. That the moving cause of such an enterprise is found in denominational attachments or beliefs, is no just argument against it. It is hardly an exaggeration to say that among all Christian peoples from the earliest times the business of providing and maintaining cemeteries has been performed by denominational agencies. The word " cemetery " itself was first used by the early Christians to denote a place for the burial of their dead. They first had the custom of building their churches on the plots which covered the remains of martyrs, and then of leaving a space around the church to be reserved for burials. The church-yard was the cemetery. Relics of this usage are still seen in the graves that surround old churches and in the juxtaposition of the church and the burying ground. All Christian denominations, however differing in other respects—except perhaps the Scotch Presbyterians and the New England Puritans—have uniformly consecrated their places of burial with some sort of religious observances. Among all these denominations without any exception the burial of the dead is associated with the belief in the resurrection of the body. Among them all funeral rites have been interwoven with and

sanctified by the ceremonies of religion, and the tomb has been esteemed sacred and guarded with pious care.

There is nothing to which the human mind clings with more tenacity than to its religious beliefs, and there is nothing which men resent with more fiery zeal than any interference with such beliefs. In ascertaining whether or not any proposed use of property will be of common convenience and necessity it might be sometimes unavoidable, and perhaps it would be at all times allowable, to take into consideration these beliefs prevalent in the community where the use is to be had, in the same way that the wealth, the populousness, the course of business, the trade and the pleasures of the community are considered.

In the early history of Connecticut the ecclesiastical society and the town were one. Then, and afterwards when the towns came to be divided into more than one ecclesiastical society, the same body that built the meeting house and settled the minister provided the burying ground and gave it such care as it had—often enough too little. The rude forefathers of every Connecticut hamlet have been "each in his narrow cell forever laid" in an ecclesiastical burying ground, attended by some denominational minister to say a last prayer at his uncovered grave.

In 1821 the legislature erected ecclesiastical societies into school societies and gave school societies power to provide burial grounds, a hearse, etc. Cemetery associations were not provided for by statute till 1841.

The plaintiffs are the private owners of certain land which they seek to use for a private cemetery. But all property of every person is holden subject to the right of the legislature to pass any laws affecting its enjoyment which tend to protect the lives or the health of the citizens, or to promote good order or the public morals. The statute above quoted is an exercise of this right by the legislature, and was passed evidently with a view to the public health. The proximity of a cemetery to a reservoir from which the inhabitants of a city procured their drinking-water would be likely to produce disease; and for that reason the legislature might pro-

perly forbid either a cemetery or a reservoir to be located within a half-mile of the other. No other reason than the preservation of health is suggested for the enactment of that statute, and no other one occurs to the court as reasonable or probable. In respect to the land owned by the plaintiffs the question of health has been eliminated by the finding of the Superior Court. It is expressly found that the use of the plaintiffs' land for a cemetery will not be detrimental to the public health. With the question of health left out, and substituting for the words "common convenience and necessity" the definition which the appellant insists is the only allowable definition of what the words mean, and the statute, so far as it can apply to the land of the plaintiffs, will read: "No cemetery or place of sepulture shall hereafter be located * * * unless the Superior Court * * * shall find that such cemetery or place of sepulture so proposed to be located is one where every person for the same measure of money has the same measure of right to be buried."

Apart from considerations of health it is just as lawful for the owner of land to bury his dead in his own soil as it is for him to sow wheat therein or to set out a rose bush. What the owner may do himself he may permit others to do, and upon such terms or under such restrictions as he may choose to impose. He may grant or refuse permission to bury the dead in his field upon precisely the same terms or upon the same sort of conditions that he may grant or refuse permission to sow wheat or plant roses there. And in either case, if he limits his permission to those only who agree with him in denominational beliefs, he violates no law.

We are brought then to this result—that if the statute is to bear the construction which the appellant puts upon it, it becomes an arbitrary command to the plaintiffs not to use their land for a private cemetery while permitting the same land to be used for a public one; thus depriving the plaintiffs of a lawful private use of their own land without compensation and without reason. We think, as no land is taken for public use, that part of the statute must be regarded as satisfied by a use so far public as this one is.

There is no error in the judgment complained of.

In this opinion the other judges concurred.