CAUSTEN BROWNE & others *vs.* ALFRED T. TURNER
& others.

Suffolk. March 30, 31, 1899. — July 3, 1899.

Present: HOLMES, KNOWLTON, MORTON, LATHROP, & HAMMOND, JJ.

*Boston Subway — Construction of Tunnel to East Boston — " Connection "*
*between Tracks of Tunnel and Subway — Statute — Evidence.*

Under St. 1897, c. 500, § 17, providing that whenever the Boston Elevated Railway
Company is authorized to begin the construction of its railroad over a certain
route, " the Boston Transit Commission shall construct a tunnel or tunnels, of
sufficient size for two railway tracks, with approaches, entrances, sidings, sta-
tions, and connections therefor, and for the running of railway cars therein,
from a point on or near Hanover Street in the city of Boston, or such other
point or points as said board may deem proper for a suitable connection with
the subway or subways provided for in " another statute, " to a point at or near
Maverick Square, in that part of Boston called East Boston, where a suitable
connection with surface tracks may be made," the connection between the west-
erly end of the tunnel and the subway is to be an actual physical connection,
and the tracks between them must come to the same grade at the point of
junction.
The fact that a copy of the report made by the Boston Transit Commission to the
city council of Boston, containing an estimate of a certain sum as the cost of a
tunnel from Maverick Square in East Boston, to a point on Hanover Street in
the city proper, along a certain route, was mailed to members of the Legislature
soon after their election, cannot affect the construction to be given to the lan-
guage of § 17 of St. 1897, c. 500, providing for the construction of a tunnel.

PETITION IN EQUITY, filed November 30, 1898, under St. 1898,
c. 490, by ten taxable inhabitants of Boston, against the treasurer
of the city and the members of the Boston Transit Commission,
and by amendment filed December 6, 1898, against the Boston
Elevated Railway Company and the West End Street Railway
Company, to restrain the construction of a tunnel to East
Boston, as proposed by said commission, assuming to act under
the provisions of St. 1897, c. 500, § 17. Hearing before *Ham-
mond*, J., who reported the case for the consideration of the full
court. The facts appear in the opinion.

*N. Matthews, Jr. & H. L. Harding*, ( *W. G. Thompson* with
them,) for the petitioners.

*T. M. Babson*, for Turner.

*A. E. Pillsbury*, for the Boston Elevated Railway Company and the West End Street Railway Company.

*S. Lincoln*, for the Boston Transit Commission.

HAMMOND, J.  This is a petition under St. 1898, c. 490.  At the threshold of the case it is urged by the respondents that the constitutional questions which the petitioners seek to raise are not open to them upon such a petition.

In view of the conclusion to which we have come in relation to the statutory question involved, we have had no occasion to consider the constitutional questions, nor of course whether they can be raised in this way.  The statutory question is simply whether the tunnel which the transit commission has voted and intends to build is such as St. 1897, c. 500, calls for.

As the first step in this inquiry it is necessary to ascertain what kind of a tunnel the commission has voted and intends to build.  On October 18, 1898, the commission passed the following vote :

" Whereas, the corporation counsel has expressed the opinion that, under sect. 17 of ch. 500 of the acts of the year 1897, this commission is authorized to build a tunnel or tunnels to East Boston either from the surface at a point on or near Hanover Street or from any subway or subways constructed under the authority of ch. 548 of the acts of the year 1894.

" Voted, that the construction of a tunnel or tunnels beginning on or near Hanover Street in the city of Boston, or beginning at such other point or points as may be proper for a suitable connection with the subway or subways authorized by ch. 548 of the acts of the year 1894, thence running to a point at or near Maverick Square in that part of Boston called East Boston, making there a suitable connection with the surface tracks, be proceeded with, and that as a preliminary the chief engineer be instructed to have surveys, estimates, and plans made for such tunnel or tunnels."

On November 29, 1898, it " Voted, that route 3–4 be adopted as the route for the East Boston tunnel as far as the vicinity of Atlantic Avenue " in the city proper, and on February 16 and February 23, 1899, it passed the following votes, respectively :

" Whereas, the statutes creating this commission and providing for the construction of the subway and a tunnel to East

Boston contemplate a system of public travel to be conducted by street railway cars :

" Voted, that, in the judgment of this commission, a connection by surface street railway tracks between the proposed tunnel to East Boston and the subway is a suitable connection within the meaning of sect. 17 of ch. 500 of the Acts of 1897."

" Voted, that the construction of the tunnel west of the point indicated in the vote of Tuesday, November 29, 1898, shall be such that the tracks shall rise to the surface of the ground by an inclined way."

In addition to these votes, the court has found the following : " The tunnel about to be constructed under the votes set forth in Exhibit 3 will run from Maverick Square in East Boston to the junction of Atlantic Avenue and Eastern Avenue in the city proper, along the route marked 3–4, as shown in Exhibit 2. The commissioners have come to no definite decision as to the precise direction of the tunnel beyond the last named point, but they are considering the feasibility of bringing the tunnel to the surface on or near Atlantic Avenue or Commercial Street by means of an incline, or of coming to the surface near North Square, or of turning in a southerly direction on Atlantic Avenue and coming to the surface at some point south of the junction of that avenue with Eastern Avenue, or of going towards the subway in some other direction."

It thus appears that the easterly terminus is to be at Maverick Square, where it will come to the surface by an incline, making there a suitable connection with surface tracks, and that the westerly terminus will be at least as far west as the junction of Atlantic Avenue and Eastern Avenue in the city proper. Whether it will come to the surface at that point, or at some distance from there, is not definitely decided, but it is certain that it will come to the surface no nearer the subway than North Square, which, as appears by the plan, is at least fifteen hundred feet from the nearest point of the subway, and much farther than that from any car entrance to the subway; and that the only connection between the tunnel and the subway is by means of surface tracks.

Is this such a tunnel as the statute calls for ?  If the statute

requires that the tunnel shall make an actual physical connection with the subway, or at least a direct and immediate connection with the subway so that passengers can pass directly from one to the other, then the question must be answered in the negative.   Otherwise it may be answered in the affirmative.

The decision of this question depends upon the interpretation to be given to the following words in § 17 of St. 1897, c. 500 : " Whenever said corporation [the Boston Elevated Railway Company] is authorized to begin the construction of its railroad over the route first applied for, as provided in section thirteen of this act the Boston Transit Commission shall construct a tunnel or tunnels, of sufficient size for two railway tracks, with approaches, entrances, sidings, stations, and connections therefor, and for the running of railway cars therein, from a point on or near Hanover Street in the city of Boston, or such other point or points as said board may deem proper for a suitable connection with the subway or subways provided for in section twenty-five of said chapter five hundred and forty-eight, to a point at or near Maverick Square, in that part of Boston called East Boston, where a suitable connection with surface tracks may be made."

Simply and briefly stated, the question is, Does this language require that the westerly end of the tunnel shall touch the subway, or at least come in direct and immediate connection with it as above stated ?

Inasmuch as the words last above quoted constitute only a part of one section in a statute of several sections, which statute is only one of several upon the same general subject of rapid transit in Boston and its immediate vicinity, it is proper to review to some extent the prior legislation on this matter, and, further, to see what was the actual condition of things, physical or otherwise, at the time of the passage of the act, so far as material to this inquiry.

The first act authorizing the construction of a subway was St. 1893, c. 478.   Section 1 provided that the mayor of Boston should appoint a board of three subway commissioners.   By § 2 this board was authorized to lay out and construct for street railway purposes a subway, with approaches, stations, exits, and entrances, from a point or points at or near the junction of Tremont and Pleasant Streets to Scollay Square ; and to other

streets near Scollay Square, to a point or points where in the
judgment of the board a suitable and advantageous exit to con-
nect with surface tracks might be obtained. By § 3, authority
was given to the board to take lands either below or upon the
surface as might be requisite, for the widening of the subway
and for suitable approaches thereto and extension thereof to
connect with surface tracks and for suitable stations, exits, and
entrances. By § 7, power was given to the board to compel the
cars of any lines of street railway running in and through said
city to run in and through the subway.

It is manifest that this statute contemplated a physical union
between the entrances to and the exits from the subway and the
surface tracks, and the commission was authorized to take such
" lands either below or upon the surface " as might be requisite
for widening the subway, and for suitable approaches thereto
and extension thereof, to connect with those tracks. In other
words, they were authorized to build the subway and to extend
the approach so as to make connection with the surface tracks.

The next statute is St. 1894, c. 548. The title is " An Act to
incorporate the Boston Elevated Railway Company and to pro-
mote rapid transit in the city of Boston and vicinity." The first
twenty-two sections provide for the incorporation of the Boston
Elevated Railway Company, and authorize it to build an elevated
railroad over certain routes therein specified, and to lease and
purchase certain street or elevated railway lines. The remain-
ing sections provide for the appointment of a Boston transit
commission, consisting of five persons, and for the construction
of subways and a tunnel.

Section 25 authorizes the commission to " construct in the
city of Boston a subway or subways, of sufficient size for four
railway tracks with approaches, entrances, sidings, stations, and
connections therefor, and for the running of railway cars thereon
through and under Tremont Street and the adjoining mall of
Boston Common, or other public or private lands adjoining or
near said street, from a point or points within one thousand feet
of the junction of Tremont Street and Shawmut Avenue to,
through, and under Scollay Square," and " to a point or points
on Washington Street or between Scollay Square and Cause-
way Street." By § 26 the commission was authorized to " con-

struct a tunnel or tunnels of sufficient size for two railway tracks, with approaches, entrances, sidings, stations, and connections therefor, and for the running of railway cars therein, from a point on or near Scollay Square in the city of Boston where a suitable connection may be made with the subway or subways provided for by this act, to a point on or near Maverick Square in that part of Boston called East Boston, where a suitable connection with surface tracks may be made."

Section 27 authorized the commission to construct subways from Tremont Street " to a point on or near Boylston Street where a suitable connection with surface tracks may be made," and another subway from Boylston Street " to a point or points on or near Columbus Avenue where a suitable connection with surface tracks may be made "; also another subway from Tremont Street " to a point on or near Staniford Street or Merrimac Square, where a suitable connection with surface tracks may be made."

By § 29 the commission " may locate and construct said subways, tunnels, approaches, tracks, sidings, stations, entrances, and connections where it deems best within the limits aforesaid," with certain exceptions not here material; and by subsequent sections, full power to take lands either above or below the surface is given for the purpose of doing the work. By § 35 the commission was authorized to grant locations for tracks to and for two tracks in said subways and tunnels to be used by any street railway company or companies.

It will be observed that the commission is to construct not only the subway proper, but also approaches, entrances, sidings, stations, and connections therefor and for the running of railway cars. That is to say, it is to bring the bottom of the subway to the surface of the ground, extending it far enough to make the connection between the subway tracks and the surface tracks, or, in other words, the point of connection from the subway side must be reached by the work which the commission is authorized to do, while the point of connection from the other side must be reached by the street railway company; and the work of both is to constitute a continuous track or a foundation therefor.

All this means an actual physical connection between the track which the commission is authorized to construct and the

rest of the track, and the commission is to make the connection, that is, the approach to the tunnel is to be extended far enough to reach the surface tracks. There is to be no intervening space between the extension of the subway and the ground where the surface tracks are laid, the ends of which are to connect with the ends of the subway tracks. The language is always the same, and it is obvious that it means an actual physical connection.

As to the tunnel authorized by § 26, the language is precisely the same as to the appurtenances connected with the tunnel and as to the connection with surface tracks at its easterly terminus, and of course it must have the same construction. But as to the westerly end the act says that the start must be made "from a point on or near Scollay Square, . . . where a suitable connection may be made with the subway or subways provided for by this act." These subways were all connected, and a connection with the subway at Scollay Square was all that was needed to enable the traveller to reach any point in any of these subways. The nature of that connection will be considered hereafter.

St. 1895, c. 440, and St. 1896, c. 492, are not material to this inquiry, and may be passed over without further notice.

We now come to St. 1897, c. 500, which contains in § 17 the language to be construed. It is entitled "An Act to promote rapid transit in the city of Boston and vicinity." The most of its provisions concern the location and construction of the elevated road. But § 5 provides that whenever the Boston Elevated Railway Company "shall request said Boston Transit Commission or the city of Boston to construct a subway in and under Cambridge Street . . . to connect with the subway now being constructed by said commission . . . said commission shall forthwith construct an incline, open cut, and subway beginning at a point on Cambridge Street," etc., and running "to a junction at Scollay Square with the subway."

Section 18 makes an additional appropriation for the payment of the costs and expenses of the subways and tunnel.

Between the passage of the act of 1894 and that of 1897 much progress had been made in the subway construction, and a contract had been made between the city of Boston, acting by the

Boston Transit Commission, and the West End Street Railway Company (to whose rights the Boston Elevated Railway afterward succeeded), by which the right to use and occupy the subways and tunnel constructed or to be constructed under the then existing statutes was granted to the street railway company, such use to be only for the location of the tracks of the company and for the operation of its railway for the purposes enumerated in the contract. Before August, 1897, and probably early in the spring, that portion of the subway extending from the entrances in the Public Garden and from those at Pleasant Street, to Park Street, was nearly completed, and the lessee was engaged in laying its tracks therein. In the spring of 1897, prior to the enactment of chapter 500 of the acts of that year, the subway was under construction in Cornhill between Scollay Square and Washington Street, in Hanover Street between Scollay Square and Washington Street, and in Washington Street between Adams Square and Haymarket Square; and the subway has since been completed along this route from Scollay Square to Travers Street. At this time the East Boston cars tapped Washington Street at Hanover Street.

By agreement of parties it also appears :

" 1. That such tunnel as the transit commission is proceeding to construct can be built within the sum now available for tunnel construction, which is $2,634,000.

" 2. That the estimated cost of such a tunnel as the Boston Transit Commission is about to construct is about $2,500,000.

" 3. That a tunnel from a point on or near Scollay Square, or from any point on the subway as now existing, to Maverick Square cannot now, and could never have, been built for any sum available for tunnel construction under the statute of 1894 or the statute of 1897. The estimates of the cost of such a tunnel are between $3,000,000 and $4,000,000. The cost of the subway as now constructed is about $4,250,000.

" 4. That a tunnel from a point on or near Scollay Square, or from any point on the present subway, to Maverick Square is materially longer and more expensive than a tunnel from any point northerly of the subway on or near Hanover Street or Atlantic Avenue, such as is proposed to be built.

" 5. That some portions of the subway authorized by St. 1894,

c. 548, viz., space for two additional tracks between Scollay Square and Park Street and between Boylston Street and Shawmut Avenue, have not yet been built; but no action has been taken by the commission looking to the construction under said act of any addition to the subway as now existing.

"6. That the only connection between the proposed tunnel and the subway such that cars can pass from one to the other will be by means of tracks run along the surface from the terminus of the tunnel to the entrance of the subway near Causeway Street.

"7. That the distance from the intersection of Commercial Street and Eastern Avenue to the entrance of the subway at Causeway Street is about 4,366 feet; that the distance from said intersection to the junction of Hanover and Washington Streets, via Fleet Street and Hanover Street, is about 2,517$\frac{5}{10}$ feet, and via Commercial and Hanover Streets about 3,346 feet.

"8. That said balance of appropriation is not sufficient to connect the tunnel with the subway by any underground structure so as to make a connection at grade and to let cars pass immediately from the tunnel into the subway and *vice versa.*

"9. That the Boston Elevated Railway Company entered into an agreement with the city of Boston, dated December 15, 1897, a copy of which is hereto annexed and marked Exhibit 4.

"10. That prior to April 1, 1897, the portion of the subway north of Scollay Square was under construction in Cornhill, in Hanover Street between Scollay Square and Washington Street, and in Washington Street between Adams Square and Haymarket Square. . . .

"12. That in the spring of 1897, prior to the enactment of chapter 500 of the acts of that year, the subway was not completed; the tunnel was not begun; it was estimated by the transit commission that the subway would cost about five million dollars; that a tunnel to East Boston from a point on or near Scollay Square, or from the point of the subway nearest to Maverick Square, could not be built for the amount then remaining available for a tunnel from the construction of the subway; and that a shorter tunnel, from a more northerly point on or near Hanover Street, could be built for two million four hundred and six thousand dollars, as appears by an estimate

on page 14 of the report of the transit commissioners dated August 15, 1896."

And the court has found that " the appropriation available for the tunnel is sufficient to construct it with an incline from the said last-named junction [the junction of Atlantic Avenue with Eastern Avenue] to a point on Commercial Street near Hanover Street, or to a point on North Square, or to a point south of said junction, but not to a point nearer the present subway than North Square."

We do not think the fact that a copy of the report made by the Boston Transit Commission to the City Council of Boston, containing an estimate of $2,406,000 as the cost of a tunnel from Maverick Square, East Boston, to a point on Hanover Street along the route marked as Route 1 on Exhibit 2, was mailed to members of the Legislature soon after their election, can affect the construction to be given to the language under discussion. The report was not made to the Legislature, was doubtless only one of many documents and papers sent to the different legislators while in office, and we cannot assume that any member read it, or that if he did he paid any particular attention to Carson's estimate, which was contained in a few lines, or that if he did pay any such attention he was at all influenced by the estimate in voting upon the bill. Nor would the statement of any member that he was so influenced be admissible. Certain general facts of common knowledge, such as some of those agreed upon in this case, may, however, be taken into consideration, under a principle similar to that under which in construing a private contract the circumstances may be shown to enable the court to see the situation of the parties.

In the light of this previous legislation and of these circumstances we are to interpret the language of the statute. The first contention of the commission is that the language does not require that the terminal point in the city must be one which the board may deem proper for a suitable connection with the subway. They submit that two distinct termini are permitted, first, at a point on or near Hanover Street in the city of Boston, without reference to any connection with the subway, and, second, such other point or points as said board may deem proper for a suitable connection with the subway; and that

the limitation that the point shall be suitable for a connection with the subway is not attached to the first terminus. But the suggestion is not much pressed, and it does not seem to us to require much discussion. The whole scope of the legislation upon the subject shows that this tunnel is to be regarded as a substitute for the tunnel authorized by St. 1894, and as one of the features of the plan of rapid transportation therein provided for. To interpret the language as giving to the commission the power to construct a tunnel which should have no relation to this plan would be out of harmony with the general nature of the legislation, and with the general purpose for which the commission was established and the nature of the authority conferred upon it.

It must be conceded that the sentence under discussion is loosely constructed, but, disregarding punctuation, as may properly be done, (*Cushing* v. *Worrick,* 9 Gray, 382, 385; *Martin* v. *Gleason,* 139 Mass. 183, 187,) and bearing in mind that the presumption is that every word of a statute is to have some force and effect, (*Opinion of the Justices,* 22 Pick. 571, 573,) so that in this case the word " other " must be supposed to have some office, and considering above all the general scope of the legislation in which the authority to construct the tunnel is found, and the general nature of the authority conferred upon the commission by whom it is to be constructed, we have no doubt that the clause " as said board may deem proper for a suitable connection with the subway," refers as well to the point " on or near Hanover Street" as to the other "point or points." The westerly end of the tunnel, therefore, must be at some point which the commission "may deem proper for a suitable connection with the subway." The commission has voted that that point shall be many hundred feet from any point of the subway, and that a connection by surface street railway tracks is a suitable connection.

The petitioners contend that the connection between the subway and tunnel must be an actual physical connection ; that the tunnel must go to the subway; and that a connection by the track of a street railway several hundred feet in length is not such a connection as the statute calls for.

The point is to be selected by the commission, and it must be

a point where a suitable connection may be made with the subway. That point cannot be fixed until the kind of connection required by the statute is first determined.

What is meant by the word " connection " as here used? The word is used in various places in the preceding statutes on this same subject, to which we have referred. Where it refers to surface tracks it means, as we have heretofore said, an actual physical connection with such tracks. Or, in other words, where there is to be a connection with surface tracks, the commission shall extend the entrance to the subway far enough to reach surface tracks, and it is authorized to take land enough for the purpose, and there is to be no intervening land between that upon which the subway rails rest and that upon which the surface rails rest. The rails are to meet physically. The authority of the commission upon the subway side of the point of meeting goes to that point; the authority of the surface road on the other side extends to that point; and there is no intervening link, no intervening authority.

This tunnel is to have two ends, the easterly end in Maverick Square, and the westerly in the city proper. The easterly end is to be carried to a point where a suitable connection with surface tracks may be made. This language is the same as that used with reference to the subway, and must receive the same interpretation. That is to say, the tunnel is to rise to the surface, and the approach is to be extended far enough to reach the surface tracks; and to that point the tunnel must go. The manner of making the connection and the details are left to the commission, but the order to the commission is to go far enough to make such a physical connection. There must be no intervening rail between the tunnel rail and the rail of the surface road.

The westerly end is to be at some point where a suitable connection may be made with the tunnel. Here, then, is the same phrase, " suitable connection." Wherever we have heretofore met it in these statutes we have seen that it means an actual physical contact. Indeed, with reference to the other end of this same tunnel it has that meaning. One of the most familiar rules relating to the interpretation of statutes is that a word or phrase repeatedly used in the same statute is presumed, in the absence of a clear intent to the contrary, to have the

same meaning throughout; and amending statutes are to be regarded as a part of the original statute within the meaning of this rule.

It is to be observed that the connection is to be made by the commission, and we can see no sound reason for making a distinction as to that duty at the different ends of the tunnel. As at the easterly end the tunnel must be extended far enough to make a physical connection with the surface tracks, so at the westerly end it must go far enough to make a physical connection with the subway; and as at the easterly end there must be no intervening link between the tunnel side and the surface track side of the point of connection, so at the westerly end there must be no intervening link between the tunnel side and the subway side of the point of connection. The tunnel must go to a point where such connection may be made, and the commission must make the connection. The commission also constructs the subway. Its authority, therefore, on both sides on the point of connection is exclusive, and there must be no intervening power. The connection is to be made complete by their authority.

This is the most natural construction of the statute, when read in the light of the previous legislation upon the same subject and of the circumstances existing at the time it was passed. Any other construction seems to us not only forced and unnatural when considering the statute by itself, but also entirely inconsistent with the main purpose of the entire body of laws of which this is a part; namely, to secure rapid transit in Boston and vicinity, and to reduce the congestion in the streets by means of a system of subways and tunnels.

But the respondents urge that no such tunnel as is called for under this construction of the statute can or ever could be built with the sum already appropriated, while the tunnel which the commission has voted can be built within the appropriation. This fact does not seem to us of much weight. It is a matter of common knowledge that the actual cost of a public work frequently exceeds the estimate, and that appropriations are made from time to time as needed, especially where considerable time is to be taken in its construction.

The change in the westerly end of the tunnel from Scollay

Square to Hanover Street or some other point is accounted for by the fact that between the passage of the two acts the subway had been extended to Hanover Street and elsewhere, so that it was no longer necessary to build the tunnel to Scollay Square to reach it. Besides, to reach the square it might be necessary to cross the tunnel in process of construction on Washington Street.

We hold, therefore, that the connection between the westerly end of the tunnel and the subway is to be an actual physical connection, and that the tracks between them must come to the same grade at the point of junction.

Upon this construction of the statute it is manifest that the commission is not authorized to construct the tunnel which it has voted to build.                 *Decree for the plaintiffs.*