## The Connecticut College for Women vs. Jeremiah C. Calvert.

Second Judicial District, Norwich, April Term, 1913.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

To constitute that "public use" for which alone private property may be condemned, two conditions must be satisfied: first, the purpose for which the property is to be taken must be public or governmental in its nature, and second, the property itself must be so administered that the benefits arising from its condemnation may be enjoyed by all without discrimination or unreasonable restriction.

A single exception to this requirement of use, by the public, is found in our Flowage Act (General Statutes, § 982), designed to encourage and promote the development of our numerous but for the most part small water-powers; but the exception itself is based primarily on the benefit and advantage which will result to the community from the utilization of the rivers and streams of the State for productive purposes, while the benefit to the private interest involved is merely incidental and is but the necessary means to the desired end.

A grant to a private educational corporation of the right to condemn property for its purposes, cannot be sustained as a constitutional delegation of the power of eminent domain, unless the corporation is under a legal obligation to admit to its courses of instruction all qualified candidates to the extent of its capacity, without religious, racial, or social distinction; for in this way only can the public make available its right to use the condemned property—a right which is essential to the validity of such a grant.

Argued April 29th—decided October 23d, 1913.

APPLICATION for the appointment of appraisers to estimate and assess damages for land owned by the defendant the taking of which by the plaintiff was alleged to be necessary for its corporate uses and purposes, brought to and tried by the *Hon. William S. Case,* a judge of the Superior Court, who sustained the defendant's demurrer and dismissed the application, from which the plaintiff appealed. *No error.*

The petitioner was incorporated by a Special Act of

1911 under the name of "Thames College." Its sole
and exclusive purpose is to establish and maintain an
institution for the higher education of women. The
control and disposition of its property and the manage-
ment of its affairs are vested in a board of trustees to be
elected by the members of the corporation. The prop-
erty of the corporation is exempted from taxation.
Later in the same session the name of the corporation
was changed to "Connecticut College for Women,"
and still later a Special Act amending the charter of
said corporation was passed in the following language:—

"WHEREAS, the higher education of the women of
this State is a matter of great public concern, and

"WHEREAS, the Connecticut College for Women has
been incorporated at this session of the general assembly
for the purpose of providing such education through
voluntary contributions without the necessity of levy-
ing taxes for the support thereof, and

"WHEREAS, it is a matter of public concern that a
suitable site should be provided for the purposes of said
Connecticut College for Women, therefore

"*Be it enacted by the Senate and House of Representa-
tives in General Assembly convened:*

"The Connecticut College for Women shall have
power to take such real estate in the towns of New Lon-
don and Waterford as its trustees shall find to be nec-
essary for the purposes of said educational corporation,
upon payment of just compensation therefor, and if
said Connecticut College for Women cannot agree
with any owner upon the amount to be paid him for any
real estate thus taken, it may proceed in the manner
provided by sections 4106, 4107, and 4108 of the Gen-
eral Statutes respecting the condemnation of land for
the site of county buildings."

Under the authority of this Act the present petition
was brought, and it was demurred to on the ground

that the Special Act was unconstitutional, in that it purported to authorize the petitioner to take the property of the respondent for a private use.

*Michael Kenealy*, with whom was *Charles B. Whittlesey*, for the appellant (plaintiff).

*Christopher L. Avery* and *Tracy Waller*, for the appellee (defendant).

BEACH, J. The only question raised by this appeal is whether the Special Act of the General Assembly approved July 27th, 1911, granting to the "Connecticut College for Women" the right of eminent domain, is a constitutional delegation of the power to take private property for a public use upon paying just compensation therefor.

The petitioner is a private educational corporation. Its real and personal property is to be held in its own name, and managed by a board of trustees to be elected by members of the corporation. The admission of students to the institution, the tuition fees to be paid, and the curriculum to be pursued will be at the discretion of the trustees. The phrase "higher education" is indefinite, but it is fair to assume that the intention is to furnish a collegiate education for women in substantial conformity to the existing accepted standards. It appears from the petition and from the amended charter of the petitioner that it has already received large gifts, and that the expenses of its establishment and maintenance will be provided, in part at least, through voluntary contributions. It, therefore, administers a public charity within the meaning of our statute of charitable uses.

The question whether universities and colleges when owned and controlled by private corporations admin-

ister a public use, as distinguished from a private use, so that they may constitutionally be given a right to take private property upon paying just compensation therefor, has, apparently, never been brought before the courts of this country for determination; and except for the Special Act under which this petition is brought, we are not referred to any statute of any State or country which purports to authorize universities or colleges when so owned and controlled to take private property under condemnation proceedings. The charitable purpose and wide public usefulness of such institutions has been recognized by exempting their property from taxation; but the right of eminent domain does not appear to have been extended to institutions of this character except when they are owned and controlled by a State.

The Act of 1911 under which this petition is brought is for the special benefit of the petitioner, and does not undertake to express the public policy of the State toward colleges and universities in general; but it is impossible to pass upon the special instance without considering the principles involved, and the question presented by this appeal is, therefore, of sufficient novelty and importance to justify a re-examination of the general principles which must be applied to its solution.

The constitutional provision authorizing the taking of private property for a public use on payment of just compensation therefor is universally admitted to be a limitation on the exercise of the power of eminent domain; and to exclude the power of taking private property for a private use. Cooley on Constitutional Limitations (7th Ed.) p. 763 *et seq.* It follows that no definition of public use for the purpose of eminent domain can be large enough to include any private use, and however elastic and indefinite the term "public use" may be, it is certain that no additional or novel

application of the power of eminent domain can justify the taking of property for a private use.

It is also well settled that as the power of eminent domain is an inherent sovereign right, the words "public use" in this connection are equivalent to "governmental use"; and that as the State itself cannot take private property except for a governmental use, so it cannot delegate to a private person or corporation the power of eminent domain except for a use which might properly be administered by the State itself, or by some political subdivision thereof. As was said by Judge Cooley in *People* v. *Humphrey*, 23 Mich. 471, 474: "The authority springs from no contract or arrangement between the government and the citizen whose property may be appropriated, but it has its foundation in the imperative law of necessity, and is recognized, and may be defended and enforced, upon the ground that no government could perpetuate its existence and further the prosperity of its people, if the means for the exercise of any of its sovereign powers might be withheld at the option of individuals. The right being thus found to rest upon necessity, the power to appropriate in any case must be justified and limited by the necessity; and whenever in any instance the government or its officials shall attempt to seize and appropriate that which cannot be needful to the due execution of its sovereign powers or the proper discharge of any of its public functions, the same means of resistance and legal redress are open to the owner that would be available in case of a like seizure by lawless individuals." *Hale* v. *Lawrence*, 21 N. J. L. 714; *Giesy* v. *Cincinnati, W. & Z. R. Co.*, 4 Ohio St. 308; *Gilmer* v. *Lime Point*, 18 Cal. 229, 252; *Brown* v. *Gerald*, 100 Me. 351, 61 Atl. 785.

The term "public use," as related to condemnation proceedings, has been strictly limited in some States to uses governmental in their nature when adminis-

tered so that the public has a common right upon equal terms to the use or benefit of the property taken. *Varner* v. *Martin,* 21 W. Va. 534; *Tyler* v. *Beacher,* 44 Vt. 648; *Bottoms* v. *Brewer,* 54 Ala. 288; *Fleming* v. *Hull,* 73 Iowa, 598, 35 N. W. 673; *Brown* v. *Gerald,* 100 Me. 351, 61 Atl. 785; *Fallsburg Power & Mfg. Co.* v. *Alexander,* 101 Va. 98, 43 S. E. 194. In Connecticut and some other States it has been defined as including also uses governmental in their nature, although administered for a private interest, when the taking itself is for purposes of great advantage to the community. *Olmstead* v. *Camp,* 33 Conn. 532; *Todd* v. *Austin,* 34 Conn. 78; *Hand Gold Mining Co.* v. *Parker,* 59 Ga. 419; *Potlatch Lumber Co.* v. *Peterson,* 12 Idaho, 769, 88 Pac. 426; *Seely* v. *Sebastian,* 4 Ore. 25; *Dayton G. & S. Mining Co.* v. *Seawell,* 11 Nev. 394; *Nash* v. *Clark,* 27 Utah, 158, 75 Pac. 371.

These two definitions correspond to the active and passive significance of the word "use," as meaning enjoyment or as meaning utility, the second definition comprehending both significations; and they lead to the same results in their application to specific cases, except in respect of the much controverted question whether the public benefit to be derived from the development of the material resources of the State will justify the delegation of the power of eminent domain in favor of private owners of lands so situated that their economic value cannot otherwise be realized. The cases dealing with this special problem have arisen under Flowage Acts, Acts in aid of mining, of the drainage of swamp lands, the irrigation of arid lands, and similar statutes, and may properly be classified in a separate group.

The other uses, which are agreed by all to be public as contrasted with private uses, may be classified under three groups as follows:—

First, property taken by the State or by some political

subdivision thereof for purposes which are exclusively governmental in their nature; as forts, arsenals, post-offices, jails, court-houses, public highways, and similar uses not administered by private persons or corporations.

Second, property taken by the State or by some political subdivision thereof for purposes which are governmental in their nature, but which may also be administered by private corporations or individuals; as schools, parks, cemeteries, markets, turnpikes, toll-bridges, wharves, and the whole range of public service activities.

Third, property taken and administered by private corporations for purposes governmental in their nature when the community has a common right upon equal terms to the use or benefit of the property taken, and when the purpose itself is, in the judgment of the legislature, so important that the development of the enterprise ought not to be prevented by the unwillingness of a private owner to sell his property for a fair price.

As to the first and second groups, it is clear that a taking by the State, or by a public corporation within its corporate authority, for the use of the public, cannot be a taking for a private use; hence the authority of the legislature, to grant the right of eminent domain to a public corporation in aid of such governmental powers as the legislature sees fit to give to it, has been properly declared to be within the discretion of the legislature. *Varner* v. *Martin*, 21 W. Va. 534; *Brown* v. *Gerald*, 100 Me. 351, 61 Atl. 785; *Tyler* v. *Beacher*, 44 Vt. 648.

When, however, the right of eminent domain is delegated to a private corporation, the justification for the taking depends not only on the character of the use as being a use which is in its nature public or governmental, but also on the manner in which the use is to be administered.

Furnishing a supply of pure water to a community is a use which is very plainly a public use because governmental in its nature; but a water company organized for the purpose of supplying water only to the members of the corporation would administer such use as a private and not a public use; and that would remain true, no matter how large its membership might be, so long as membership was a matter of privilege and not of right. The constitutional authority of the legislature to delegate the power of eminent domain to private corporations does not depend solely on the character of their corporate purposes, as to whether they are governmental in their nature or not; but, as is universally agreed, depends also upon the common and equal right of the public to the benefit of the service rendered, free from unreasonable discrimination, with the exception already noted, namely, that in some States, including Connecticut, an exception is made in favor of the owners of lands so situated that their economic value to the State cannot be developed without subjecting adjoining lands to some easement necessary for that purpose.

It is for the legislature to say whether any given use is governmental in its nature or not, subject to review by the courts only in exceptional cases of extreme wrong; and in the present case we accept and endorse the legislative declaration that the higher education of women is in its nature a public use. But the question whether in any given instance the use is or will be administered as a public or as a private use, is a question which must of necessity be determined by the courts in accordance with the facts of the particular case in hand.

This distinction has never been more clearly illustrated than in the case of *Evergreen Cemetery Asso.* v. *Beecher,* 53 Conn. 551, 5 Atl. 353, in which this court

sustained a demurrer to a petition for the appointment of appraisers in condemnation proceedings brought under the provisions of the General Statutes of 1875 relating to the taking of land for cemeteries; and in the course of its opinion pointed out that although the establishment of cemeteries was a use which was public in its nature, yet the petition was insufficient because it did not appear that the petitioner's cemetery was one in which the public had or could acquire the right to bury their dead, saying: "The safety of the living requires the burial of the dead in proper time and place; and, inasmuch as it may so happen that no individual may be willing to sell land for such use, of necessity there must remain to the public the right to acquire and use it under such regulations as a proper respect for the memory of the dead and the feelings of survivors demands. In order to secure for burial places during a period extending indefinitely into the future that degree of care universally demanded, the legislature permits associations to exist with power to discharge in behalf and for the benefit of the public the duty of providing, maintaining and protecting them. The use of land by them for this purpose does not cease to be a public use because they require varying sums for rights to bury in different localities; not even if the cost of the right is the practical exclusion of some. . . . But it is a matter of common knowledge that there are many cemeteries which are strictly private; in which the public have not, and cannot acquire, the right to bury. Clearly the proprietors of these cannot take land for such continued private use by right of eminent domain. The complaint alleges that the plaintiff is an association duly organized under the laws of this State for the purpose of establishing a burying ground; that it now owns one; that it desires to enlarge it; and that such enlargement is necessary and proper. There is

no allegation that the land which it desires to take for such enlargement is for the public use in the sense indicated in this opinion. Therefore the Superior Court is advised that for the reason that the complaint does not set out any right in the plaintiffs to acquire title to the land of the defendants otherwise than by their voluntary deed, the demurrer must be sustained." And in *Starr Burying Ground Asso.* v. *North Lane Cemetery Asso.*, 77 Conn. 83, 87, 58 Atl. 467, we said: "The burial or other safe disposition of the dead is a necessity essential to the preservation of the health of the living. The private use of land for this purpose by a private corporation may be of public convenience and necessity, as that term is sometimes used, although not strictly a public use justifying condemnation of land for that purpose. *Application of St. Bernards Cemetery Asso.*, 58 Conn. 91, 92 [19 Atl. 514]. But where land is appropriated for a burying-ground by a town or other municipal corporation, or by owners of the land— being a voluntary association or private corporation— and the land so appropriated is open, under reasonable regulations, to the use of the public for the burial of the dead, it may become a public burial-ground and its use a public use, and the legislature may lawfully condemn land for that public use. *Edwards* v. *Stonington Cemetery Asso.*, 20 Conn. 466; *Evergreen Cemetery Asso.* v. *New Haven*, 43 Conn. 234; *Evergreen Cemetery Asso.* v. *Beecher*, 53 Conn. 551 [5 Atl. 353]."

The principle is elementary, and extends logically to all cases in which a corporate purpose, governmental in its nature, is sought to be aided by the delegation of the power of eminent domain. In such cases the vital question is whether it appears that the public will have a common right upon equal terms, independently of the will or caprice of the corporation, to the use and enjoyment of the property sought to be taken. *In re*

*Eureka Basin Warehouse & Mfg. Co.,* 96 N. Y. 42; *Fork Ridge Baptist Cem. Asso.* v. *Redd,* 33 W. Va. 262, 10 S. E. 405; *Minnesota Canal & Power Co.* v. *Koochiching Co.,* 97 Minn. 429, 107 N. W. 405; *Berrien Springs Water-Power Co.* v. *Circuit Judge,* 133 Mich. 48, 53, 94 N. W. 379; *Madera County* v. *Raymond Granite Co.,* 139 Cal. 128, 135, 72 Pac. 915; *Jones* v. *North Georgia Electric Co.,* 125 Ga. 618, 54 S. E. 85; *Rockingham County Light & Power Co.* v. *Hobbs,* 72 N. H. 531, 58 Atl. 46; *Arnold* v. *Covington & Cincinnati Bridge Co.,* 62 Ky. (1 Duv.) 372; *In re Rhode Island Suburban Ry. Co.,* 22 R. I. 457, 48 Atl. 591.

Neither the industry of counsel nor our own research has discovered any case (subject to the exception already noted) in which the courts have sustained as constitutional a grant of the right of eminent domain in favor of a private corporation administering a purpose governmental in its nature, whether educational, charitable, or otherwise, except when there was secured to the public a common and equal right to the use or benefit of the property taken. All of the authorities, whether their conception of a public use is founded solely on a use by the public or whether it includes also the public utility and benefit, agree in the results which have thus far been indicated; but there is a conflict of authority as to the constitutionality of the Flowage Acts, irrigation and drainage laws, and other statutes intended to promote the development of the material resources of a State, in so far as they give to private landowners the right of eminent domain for purposes in which the public have no direct interest. In Vermont (*Tyler* v. *Beacher,* 44 Vt. 648) and in Virginia (*Fallsburg Power & Mfg. Co.* v. *Alexander,* 101 Va. 98, 43 S. E. 194) Flowage Acts conferring the right of eminent domain on private persons or corporations have been held unconstitutional; and in the courts of some other States,

in cases already cited, like opinions have been expressed in discussing the general subject. In Massachusetts and, perhaps, in the Supreme Court of the United States, such Flowage Acts are sustained on the theory that the taking of private property authorized thereby is not in the exercise of the power of eminent domain, but in the nature of a regulation of the rights of common proprietors of the water-power in respect of a property which cannot be partitioned or enjoyed in common. *Bates* v. *Weymouth Iron Co.*, 62 Mass. (8 Cush.) 548; *Lowell* v. *Boston*, 111 Mass. 454; *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9, 5 Sup. Ct. Rep. 441. The reasoning of these cases has provoked some criticisms. *Brown* v. *Gerald*, 100 Me. 351, 365, 61 Atl. 785; *Avery* v. *Vermont Electric Co.*, 75 Vt. 235, 242, 54 Atl. 179. In Connecticut and (with some hesitation) New Hampshire, the Flowage Acts have been justified as an exercise of the power of eminent domain on the ground that the development of the water-power of the State was a public benefit which could not otherwise be realized. *Olmstead* v. *Camp*, 33 Conn. 532; *Todd* v. *Austin*, 34 Conn. 78; *Great Falls Mfg. Co.* v. *Fernald*, 47 N. H. 444; *Salisbury Mills* v. *Forsaith*, 57 N. H. 124; *Water Commissioners* v. *Manchester*, 87 Conn. 193, 87 Atl. 870. In Georgia, the same reasoning has been applied in sustaining a statute authorizing the taking of property in order to divert a stream for the development of a gold mine. *Hand Gold Mining Co.* v. *Parker*, 59 Ga. 419. In *Nash* v. *Clark*, 27 Utah, 158, 75 Pac. 371, a statute authorizing an owner of arid land, acting solely in his own interest, to condemn a right of way for enlarging an irrigation ditch across the land of another was sustained. In *Highland Boy Gold Mining Co.* v. *Strickley*, 28 Utah, 215, 78 Pac. 296, a statute authorizing a mining company to condemn a right of way across adjoining lands for the construction of an overhead

tramway was also sustained. So in California, Nevada, North and South Dakota, Arizona, and other States in the arid-land district, irrigation is recognized as a public use because necessary to the development of the natural resources of the State. By the Constitution of Idaho "the necessary use of lands . . . to the complete development of the natural resources of the State . . . is hereby declared to be a public use." Art. 1, § 14. And the Supreme Court of the United States has recently come to recognize the right of each State to declare those uses public which are necessary to the development of its natural resources. "The rights of a riparian owner in and to the use of the water flowing by his land are not the same in the arid and mountainous States of the west that they are in the States of the east. These rights have been altered by many of the western States, by their constitutions and laws, because of the totally different circumstances in which their inhabitants are placed, from those that exist in the States of the east, and such alterations have been made for the very purpose of thereby contributing to the growth and prosperity of those States arising from mining and the cultivation of an otherwise valueless soil, by means of irrigation. This court must recognize the difference of climate and soil, which render necessary these different laws in the States so situated." *Clark* v. *Nash*, 198 U. S. 361, 370, 25 Sup. Ct. Rep. 676.

These cases proceed upon what appears to us to be the right of a State, as a measure of self-preservation, to prevent the stubbornness or avarice of a private proprietor from obstructing the development of its own physical resources.

The developed and undeveloped water-powers of Connecticut constitute, in their aggregate, a public asset which is and will be of great value in the interna-

tional struggle for economic advantage; and it seems to us to be the right of the State to promote the development of such a natural resource, by delegating the power of eminent domain for that purpose so far as may be necessary. And if the fact be, as it is with respect to our Connecticut water-powers, that they are for the most part too small for a use by the public, and are adapted only for use in connection with private industrial enterprises, so that the delegation of the power of eminent domain in favor of private persons is necessary to the development of the aggregate water-powers of the State, then such an exceptional delegation of the power of eminent domain is justified on the ground that it is to be exercised primarily for the public use of developing the water-powers of the State, and the incidental benefit to the private interest involved, is but the necessary means to that end. In all such cases the use or purpose of developing the material resources of the State is governmental in its nature, and the delegation of the power of eminent domain to private landowners for that purpose is justified not only by its necessity, but also because the public benefit aimed at is accomplished as soon as the water-power, or other natural resource is developed, and does not depend upon the mode of its continued use. Such a taking is directly for the benefit of the State as the owner in sovereignty of its own territory.

The principle of the cases arising under legislation in aid of the material resources of the State is limited, as already pointed out, to the case of lands so situated that their economic value cannot be realized without subjecting adjoining or neighboring land to some easement amounting to a taking, and does not include the ordinary human activities, which collectively, or in an abstract sense, are advantageous to the community, but which in any concrete case may be administered

in a private interest; for in such cases, as already shown, the direct public benefit, if any, results from the use, or right of use, by the public. *Evergreen Cemetery Asso.* v. *Beecher*, 53 Conn. 551, 5 Atl. 353.

The result of this review of the principles is that the right of eminent domain cannot constitutionally be delegated to a private person or corporation unless for a use which is governmental in its nature, and unless the public has or can acquire a common right on equal terms to the use or benefit of the property taken; except only that the use, or right of use by the public, may be dispensed with when a public benefit results from the taking, which cannot otherwise be realized, and which continues to exist although the public has no use or benefit of the property taken.

The next subject of inquiry is whether the petitioner brings itself under the rule above stated; and in approaching that question we desire to reaffirm our acceptance and approval of the legislative declaration that the higher education of women is a use which is governmental in its nature. But, to paraphrase the language of *Evergreen Cemetery Asso.* v. *Beecher*, 53 Conn. 551, 5 Atl. 353, it is a matter of common knowledge that there are many colleges for the higher education of women in which the public have not and cannot acquire the right to be educated. Clearly the proprietors of these cannot take land for such continued private use by right of eminent domain. There is no allegation in the petition that the public has or can acquire the right to enjoy the benefits of the land sought to be taken, no provision to that effect in the petitioner's charter, and the stated corporate purposes of the petitioner are not such as to impose upon it, as a necessary legal consequence of its corporate character, the obligation of admitting to its courses of instruction all qualified candidates, to the extent of its capacity, without

religious, racial, or social distinction.  The petitioner,
although directly challenged on this point by *Judge
Case's* memorandum sustaining the demurrer, has not,
either by amendment, assignment of error, or in its
brief or argument, disclaimed authority to select its
own beneficiaries.  This case falls directly within the
decision of *Evergreen Cemetery Asso.* v. *Beecher,* 53
Conn. 551, 5 Atl. 353.

It is argued that a sufficient measure of governmental
control may be found in the supervisory power of the
courts to enforce charitable trusts.  But governmental
control, except as a means of enforcing an existing
public right of use or enjoyment, has no direct relation
to the delegation of the power of eminent domain, for
it is limited only by the extent of the police power.
Moreover, the power of courts to enforce charitable
trusts extends no further than the power to interpret
and enforce the provisions of the instrument creating
the trust.  The question whether a given individual
has or has not a right to be admitted to the Connecticut
College for Women—if anybody at all shall have an
enforceable right of admission to that institution—will
depend not upon the will of the State, but upon the
question whether such a right is given by the terms of
some charitable bequest or deed of trust expressing the
wishes of a private benefactor.  In fact, the statute of
charitable uses is, so far as any public right is concerned,
the negation of State control.

The petitioner also claims that the higher education
of women is a matter of great public utility within the
meaning of the Flowage Act cases; so that the public
benefit resulting from the establishment of the Con-
necticut College for Women is a sufficient justification
for the delegation of the power of eminent domain, and
that it is not necessary that the public should have any
right, independent of the will or caprice of the peti-

tioner, to share in its educational advantages. This claim brings us to a consideration of the statutes and decisions of some of the States, as bearing upon the relation of higher educational institutions to the State.

Excluding agricultural and other technical colleges, there are, in at least thirty-two States, universities for the higher education of men and women, owned directly by the State, or held for the State by corporations created for that purpose. These universities are governed by boards of directors, appointed or elected as other public officials are, except in Indiana, where the trustees are elected by the alumni; but in that State the governor, lieutenant-governor, speaker of the house, and judges of the Supreme Court are *ex officio* members of the board of visitors. These boards all have power, either specifically expressed in statutes or necessarily to be inferred from their broad general authority, to appoint and remove professors, to regulate the curriculum, and to fix tuition fees where they are required; although in some States the tuition fees are fixed by statute and in a few States the curriculum is outlined by statute. In many States these universities are expressly declared by law to be open to all; in others sectarian or partisan tests for admission are forbidden; in some the proportionate representation of students from different parts of the State is regulated by statute; and in some the common and equal right of the public to the benefit of the institution is left to be inferred from State ownership and control. In Kansas it has been held that the faculty has no power to exclude a student from the library for nonpayment of library fees. *State* v. *University of Kansas*, 55 Kan. 389, 40 Pac. 656. And in Minnesota a writ of mandamus will lie to reinstate a student wrongfully expelled. *Gleason* v. *University of Minnesota*, 104 Minn. 359, 116 N. W. 650.

The fact that these public universities exist and flourish in so many States is conclusive proof that the necessity which justifies the grant of eminent domain to private persons in order to develop the material resources of a State, does not exist in the case of institutions for the higher education of women. In other States, and formerly in Connecticut, the proceeds of the Federal grants for education have been paid over to privately owned colleges; and in such cases the rule appears to be the same elsewhere as it was in this State, that the institution is required to furnish free education to a stated number of students nominated by the State. General Statutes (1888), § 2255. In this respect higher educational institutions have been put on the same footing as hospitals and other charitable institutions receiving State aid. General Statutes (1902), § 2852. The cases relating to educational institutions have not dealt directly with the right of eminent domain, but with the right to expend public funds for their benefit and support. In the following cases the right to use the public funds in favor of educational institutions was denied, on the ground that the institutions were not under public control. *Curtis* v. *Whipple*, 24 Wis. 350; *Jenkins* v. *Andover*, 103 Mass. 94; *St. Mary's Industrial School* v. *Brown*, 45 Md. 310. In *State* v. *Graham*, 25 La. Ann. 440, an appropriation in favor of Straight University was held to be unconstitutional, not only because of the lack of State control, but also because "it is not bound to accept any indigent students unless the State extends aid to the institution." In *Elsberry* v. *Seay*, 83 Ala. 614, 3 So. 804, an Act establishing a State University for colored people was held unconstitutional because it conflicted with the fundamental conception that public education should be in favor of all, and disturbed the apportionment of the school funds between the races in proportion to

the number of children of each race.  In *Brooke Academy* v. *George*, 14 W. Va. 411, an appropriation in favor of the Academy was held unconstitutional, both on the ground of lack of governmental control, and because "the citizens of the State of Virginia had no privileges in the Brooke Academy, that were not common to the people of Ohio and Pennsylvania or those of any other State.  The trustees of the Brooke Academy might exclude any and all citizens of Virginia from having any control of the institution or from even sending their children to the Academy." In *Holt* v. *Antrim*, 64 N. H. 284, 9 Atl. 389, a statute authorizing school districts to contract with academies or other educational institutions for the education of their pupils, and to use the school funds for that purpose, was sustained as constitutional expressly on the ground that the requirements of a public use were satisfied because the public had "a common and equal right, free from unreasonable discrimination," to the education contracted for.

We find no authority in the decided cases for the position that colleges stand in any different relation to the State from other public charities; and we are unable to see how any distinction can be drawn which would justify the delegation of the power of eminent domain to colleges, while denying it to private hospitals, orphan asylums, or cemeteries.  In truth the charitable character of such institutions is of no logical significance in this discussion, except as it brings them within the more general classification of governmental uses.  If the use is governmental in its nature, and the public right to the promised benefit is secured, it is immaterial whether the corporate purpose is administered as a public charity or for profit.  *West Hartford* v. *Water Commissioners*, 44 Conn. 360.  Therefore, if we should grant that the legislature had constitutional authority to delegate the right of eminent domain in favor

of private corporations because their purposes were high and charitable, although the public had no common right on equal terms to the benefit promised, we should be logically unable to restrain the exercise of the same authority in favor of private corporations operated for profit and administering purposes governmental in their nature for the exclusive use of their own members and selected beneficiaries. As we said in the recent case of *Beach* v. *Bradstreet*, 85 Conn. 344, 359, 82 Atl. 1030: "The right of private property should, and does, rest upon a firmer basis than this."

The term "public use" has nowhere received a wider judicial definition than in *Olmstead* v. *Camp*, 33 Conn. 532, and *Todd* v. *Austin*, 34 Conn. 78, and, from another aspect of the same general subject, in *Yale University* v. *New Haven*, 71 Conn. 316, 42 Atl. 87. The principle which these cases establish for this State is that our General Assembly has discretionary jurisdiction to declare any use public which is greatly for the benefit of the community, and that this discretion is subject to review by the courts only in case of extreme error.

Nevertheless, there must still remain for the courts, in all cases where the use in question is capable of being administered either for a public or for purely private end, the question whether the public has or can acquire the right to the use or benefit of the property sought to be taken.

If the property is to be privately administered, and the public has not and cannot acquire a right to its use or benefit, the power of eminent domain cannot, upon principle and upon authority, be delegated in aid of a governmental use; unless, as in the development of the natural resources of the State, a direct benefit to the State results from the taking, which benefit continues to exist although the property taken be subsequently

used for a private use, and then only when such benefit cannot otherwise be fully realized.

There is no error.

In this opinion PRENTICE, C. J., THAYER and RORA-BACK, Js., concurred.

WHEELER, J. (dissenting).  The "Thames College" was duly incorporated.  16 Special Laws, p. 101.  Section 2 recites: "The sole and exclusive purpose of said corporation shall be to establish, organize, maintain, and conduct an institution for the higher education of women."  By a later Act (16 Special Laws, p. 291) its name was changed to "Connecticut College for Women."  By a later Act (16 Special Laws, p. 385) the General Assembly empowered it to take such real estate in the towns of New London and Waterford as its trustees should find to be necessary for its corporate purposes, upon payment of just compensation.

The College brings its application under this Act to condemn land which it alleges is necessary for its site.

The defendant demurs to the application, claiming that the General Assembly could not constitutionally delegate to this College the power of eminent domain, because the land to be taken is taken for a private use, and not for a public use.

The constitutionality of the Act is assailed because its purpose—the higher education of women—is claimed to be a private and not a public use.  Private property cannot be taken for a private use; it can only be taken for a public use.  In determining whether the purpose of this Act be public or not, the court should resolve every reasonable intendment in favor of the legislative declaration that the purpose of the Act is public.  In case of doubt it should resolve the doubt in favor of the validity of the Act.  Unless it be so clear that there can

be no reasonable doubt that the purpose declared to be public is in fact private, the court must uphold the Act. This is a rule of construction heretofore uniformly adhered to by us. *Beach* v. *Bradstreet*, 85 Conn. 344, 349, 82 Atl. 1030.

The opinion of the court holds that a use administered for a private interest may be a public use within the constitutional limitation, if it be (1) a use governmental or public in its nature, and (2) one to the benefit of which the public have a common and equal right.

It further holds that the higher education of women, which is the purpose of the petitioner's charter, is public in its nature, but that there is nothing in its charter, or in its application, which shows that the public have or can acquire a right to the benefit of its corporate purpose upon equal terms. In short, it holds that the right of eminent domain might be granted a private corporation whose purpose was the higher education of women, provided that, under its charter, the public had the right to enjoy upon equal terms the education so provided, and the application showed that the corporation was to use the land taken for this purpose. If such a use had been shown, the grant to the petitioner must have been sustained. The court thus holds that there is no insuperable constitutional objection to granting to a private corporation engaged in the higher education of women the right of eminent domain.

Since the charter is a part of the application, no further allegation was necessary. Whether the use granted is open to the public or not, is to be determined by the terms of the charter read in the light of its history. An allegation in the application, for example, that the trustees had voted to open the doors of the College to all women, could not add to or subtract from the terms of the charter. What the trustees do they can undo; what the charter gives remains.

A college is open to the public on equal terms, although admission to it is surrounded by reasonable regulations which do not prohibit, in a partial way, the public from the right to enjoy the benefits of the institution. For example, an examination for admission, or a limitation of the number of students, would be reasonable regulations, provided all of the public have the equal opportunity to take the examination and to be admitted without discrimination. With this interpretation of the meaning of "open to the public on equal terms," I do not understand my brethren to differ. It is my clear conviction that under this charter the petitioner is bound to furnish to all women upon equal terms the higher education provided for by its charter, and that the land sought to be taken is to be used for this purpose. If this conclusion be sound, the foundation on which the opinion rests falls.

Let us now assume, as my brethren hold, that a prerequisite of the grant of eminent domain to the Connecticut College for Women is that the education it provides shall be open to the public upon equal terms.

With little or no argument, the opinion holds: "There is nothing in the petitioner's application or charter to show that the public has or can acquire a right to the benefit of its corporate purposes." We think a fair and reasonable construction of the charter leads to the conclusion that the education to be furnished by this College will be open to all women of our State upon equal terms. It is worth noting that the counsel, who have twice argued this question to this court, refrained from making the claim upon which the opinion rests, but contended that the right of eminent domain was limited to the taking of private property for a governmental purpose, which they asserted was the equivalent of governmental control, and therefore the constitutional inhibition limited the right to take save when

done under the control or regulation of the State. The opinion holds that governmental purpose, as used by it, is such use as "might properly be administered by the State itself, or by some political subdivision thereof."

These ideas of governmental purpose are thus seen to be diametrically opposed. The former has some authority to support it; the latter none which we have found. Each principle acknowledges many exceptions, and all, when analyzed, are found to rest upon the public welfare served. And neither makes provision for new public uses, which the changing conditions of society have developed in the past, and are sure to develop in time to come.

The Connecticut College for Women was chartered for the sole and exclusive purpose of establishing, maintaining, and conducting an institution for the higher education of women. The purpose as expressed is not in terms limited to some women, nor to such classes of women as its board of trustees may select. Its education is for women. The charter does not in terms impose upon the trustees the obligation of affording to all women the benefits of the institution. Nor does it, in terms, attempt to discriminate against any women or classes of women. There is nothing in the charter inconsistent with the existence of an obligation to furnish its education to all women.

It was not necessary that this obligation should be imposed in express terms. By the every-day construction placed upon general language of a similar character in all kinds of charters, the imposition of such duty would be implied from the general language used. In very few of the charters of private water companies granted by our General Assembly, containing authority for the exercise of the right of eminent domain, do we find a specification that they shall serve the public on equal terms. Unless the language used necessarily

forbids, this duty would be implied. By the acceptance and exercise of the power, the corporation impliedly undertakes to serve the public located along its mains and laterals, without discrimination, upon equal terms. In other charters granting the right of eminent domain, we find the grant in general terms, without specification of a use by the public. This we find, for example, in the charters of the North Branford Light, Water, and Power Company (15 Special Laws, p. 839) and of the Connecticut River Company (15 Special Laws, p. 774). And this is the only permissible legal construction of the charter of the Connecticut College. *Rockingham County L. & P. Co.* v. *Hobbs,* 72 N. H. 531, 537, 58 Atl. 86.

In the amendatory Act according the corporation the power of eminent domain, the General Assembly recited that "the higher education of the women of this State is a matter of great public concern," and that the corporation was incorporated "for the purpose of providing such education." The higher education referred to is that designated in the first preamble to the amendment, viz., "the higher education of the women of this State." The amendment and charter are to be construed together, and held to afford its benefits to the women of the State. *Browne* v. *Turner,* 174 Mass. 150, 54 N. E. 510. In terms it is not limited to a portion of the women of the State, but may refer to all women of the State. It is repulsive to all of our legislative history to conceive that a Connecticut General Assembly intended by its general language, "women of the State," to refer to a part of the women of the State rather than all, or to such only as the trustees might esteem entitled to the blessings of the higher education. What reason can be assigned for its desire to benefit the few rather than the many? The College is to perform the duty of the State. It is com-

mon knowledge that a college of this character entails a great expenditure. The interest of the State is to have it serve all the women of the State. Why, then,' should the General Assembly be assumed to have acted against the interest of the State? Where adherence to the letter of the law will work injustice, courts are accustomed to give to an Act a reasonable construction so as to avoid injustice. *Carter* v. *Whitcomb*, 74 N. H. 482, 69 Atl. 779; *Kelley* v. *Killourey*, 81 Conn. 320, 70 Atl. 1031; *In re King's Estate*, 105 Iowa, 320, 75 N. W. 187. A construction of the Act such as my brethren make leads to injustice to the women of the State and to the State itself. It is a fundamental principle that an Act is to be construed so as to effectuate the intent of the General Assembly. *In re Kilby Bank*, 40 Mass. (23 Pick.) 93. When the General Assembly, three months after the granting of the charter, by amendment changed its name, and gave to this institution its own name, their act was of peculiar significance. It was done upon knowledge, reflection, and deliberation. It marked this institution as a *quasi*-public one, and helped justify the faith of the General Assembly, as subsequently expressed, that its cause was of "great public concern." Is it conceivable that the State would have given its own proud name to a purely private institution whose trustees could, at will, exclude from its priceless privileges any woman of the State, upon any ground it chose, religious or otherwise, or upon no ground at all?

The legislative intent and the necessary meaning of the language, "women of the State," is shown when the character of this institution is considered in connection with the grant of the right of eminent domain and the necessity of the grant for the fulfilment of its · purpose. The charter creates a corporation, organized without capital stock, and one which can never

be operated for a profit to it, or to the interest of its incorporators or trustees. It is conceded to be a charity, engaged in a service upon which the State and society lean. In virtue of its character, the State exempted it from taxation, and gave it the power of eminent domain. In virtue of its character, the law attaches to it certain duties, and accords it certain protection, to the end that all of its activities and resources shall be devoted, *in perpetuam*, to its charitable purpose, the higher education of women. General Statutes, § 4026. The law as administered by our courts will hold institution and trustees to this purpose, and the State will exercise its care, through its proper law officers, to see that it fulfils its trust. *Jackson* v. *Phillips*, 96 Mass. (14 Allen) 539, 576–580. Moreover, by its acceptance of the charter, the Connecticut College contracted with the State to carry out the purpose of the grant. While it lives, its estate is pledged to execute this trust. Such an institution is not a mere private one, but a *quasi*-public one. It will perform duties which the State might directly perform, but thus far, in the main, has left for private agency to support. The use and not the agency employed give it its public purpose and character. The General Assembly regarded this College in this way, and did not intend to narrow the scope of its usefulness.

The trustees can enact by-laws in consonance with the charter, but no by-law or act of theirs can conflict with the purpose of the charter. If the trustees attempt to limit the education afforded to defined classes, or to exclude, in a partial way, certain women or classes of women from its benefits, their action would negate the purpose of the charter by denying to some women the privileges accorded by the charter to all.

The State may directly provide "the higher education" for the women of the State, or it may delegate

to a private agency this duty. Our courts will take judicial knowledge of the fact that there is within the State no other college for women. In the charter granted the petitioner, there was no power of eminent domain given. By amendment the General Assembly recited that "the higher education of the women of the State is a matter of great public concern"; that the Connecticut College for Women had been incorporated "for the purpose of providing such education through voluntary contributions without the necessity of levying taxes for the support thereof"; and that it was a matter of great public concern that a suitable site should be provided for this purpose. Therefore, it enacted that this College "shall have the right to take such real estate in the towns of New London and Waterford as its trustees shall find to be necesssary for the purpose of said educational corporation upon payment of just compensation therefor." The General Assembly thus found a necessity for this grant. Is it not apparent that the General Assembly thought this institution would perform duties of great service to the public, and provide through voluntary contributions, without cost to the State, an education for the women of the State which she might well provide? Therefore, in consideration of these benefits to the State and of these voluntary contributions, the grant of eminent domain was made. The consideration of the grant is the provision by this College for the higher education, thus relieving the State from the duty of supporting it, or of providing a like education. In effect, the State has entered into a contract with the College and all of its contributors, in presenti and in futuro, that it gives the College the right to secure a site by condemnation in consideration of the benefit to the State through having such an institution within her borders supported by voluntary contributions. Whether it be wholly true or

not, the demurrer admits that this institution is to be maintained wholly by voluntary contributions, and that it is to such an institution this grant is made. And the demurrer further admits that upward of $1,150,000 and land of great value have been donated to this College. With each contributor the State entered into a contract that it had granted this charter with its right of eminent domain in consideration of his contribution. The State has pledged its faith to the corporation and to all contributors that this grant of eminent domain shall stand while the institution exists. The State would not have entered into such a contract unless it had intended the benefits of the charter to be enjoyed by all the women of the State. The contributors would not have showered their bounty upon the new institution had they understood that the blessings of their bounty would fall upon a part only of the women of the State, and that its trustees might, at will, shut its doors upon any it chose, favoring some, excluding others.

The construction which my brethren accord the Act violates the faith of the State, breaks its contract with the contributors, and may tend to check the growth of the College. Can it be believed that the General Assembly and Governor Baldwin intended to limit the privileges of the College to such women of the State as the trustees decided could enjoy its privileges, and thus cripple the new College, whose great promise led the State in its pride to give its own name? The Act locates the College in New London. It is a part of the history of the State that New London sought the honor of this institution. She and her people have, with a self-sacrifice and generosity never excelled in modern times by any town in the State, given to this institution. As much as a town and its people can, they have stamped it of great public concern to them and to the people of the State. Did New London intend to give of its

wealth to a College whose trustees could at will admit
to its privileges some women of the State while denying
them to others? Did New London intend to help rear
a College of this character? Rather, did they not hope
for a College like unto the great institutions for the
higher education of men and women in New England,
whose doors are open to all alike, and whose influence
is nation-wide? The history of this charter shows the
legislative intent. The history of Yale's charter shows
a similar intent. In terms its privileges are not open
to all; but none can dispute that such was the legislative
intent. *Yale University* v. *New Haven,* 71 Conn. 316,
329, 42 Atl. 87.

The concluding words of the amendment providing
a method of condemnation similar to that for the con-
demnation of land for the site of a county building re-
veals the legislative mind. The site of the College was
put upon a parity with the site of a county building.
This indicates its public character. The General
Assembly did not intend to close the doors of the Col-
lege to the public any more than it did the doors of a
county building.

The General Assembly declares that a suitable site
for this College is of great public concern. It could not
speak thus of a purely private institution of learning
whose doors were not open to the public on equal
terms. By the admission of the demurrer, the land to
be taken is necessary for the purpose of the charter.
So that the case is that of a College charged with the
perpetual duty of furnishing the higher education to
the women of the State, and given the right to take
private land for a site and intent on taking land which
it needs to carry out the purpose of its existence.

The construction of the charter as made by the major-
ity of the court is, it seems to me, a restricted and nar-
row one. It disregards the intent and purpose of the

General Assembly. It ignores the fact that we are passing upon the validity of an Act of a co-ordinate department of government. It treats the question with a circumscription not permitted in construing an ordinary legislative Act. It forgets that we are applying to this Act a rule of constitutional construction, and not interpreting a private contract, nor even an ordinary legislative Act. And, above all, it ignores that foundation rule of constitutional construction that a legislative Act is to be upheld unless its repugnancy to the Constitution is so clear as to be beyond a reasonable doubt. The public welfare demands, in this case, that that rule be adhered to.

In stripping this College of its power to condemn land for its site, the court was compelled to go even further than to make a narrow, unfortunate, and untenable construction of the Acts comprising this petitioner's charter. It was forced to give to the term "public use" a meaning contrary to that long held by us, and in effect to overrule decisions of this court which have stood for over sixty years, and rest upon, what seems to me, the better reason. I shall not attempt to point out or discuss much of the argument of the opinion, but shall confine my discussion to its misconception of the term "public use" as heretofore understood in Connecticut jurisprudence.

From an early time we have had a clear conception of the principle underlying "public use," and we have steadily adhered to it. When the opinion holds that that only can be a public use which is governmental, or in its nature so, and defines such use to be one "which might properly be administered by the State, or some political subdivision of the State," I think that instead of stating a well-settled principle, as it asserts, it invokes a novel proposition, and a test of public use not found in the opinions cited in its support or elsewhere.

It seems futile to combat the statement further than to suggest that the right of eminent domain has been supported when granted to individuals and corporations in their private business in aid of all sorts of public utilities,—mining enterprises, grain-elevators, cemeteries, grain-mills, petroleum transportation, and schemes of private drainage and irrigation; and in our State in aid of a mill for the manufacture of axe handles and tinware. *Todd* v. *Austin*, 34 Conn. 78. Many of these are activities which neither the State nor any of its political divisions has essayed in aid of private enterprise, and some the universal opinion would forbid its trying. The opinion supports Acts giving the right of eminent domain in aid of private ownership of mills, mining, drainage, and irrigation. None of these can be properly held to be a purpose which the government or any of its political divisions could administer. Thus, I think, the opinion refutes its doctrine that governmental use is a prerequisite of public use.

Its second prerequisite, that the use must be one in which the public has or can acquire a common right on equal terms to the use of the property taken, is a view which we expressly repudiated in *Olmstead* v. *Camp*, 33 Conn. 532, 546, and impliedly rejected in other decisions. Some authorities hold that a grant of eminent domain cannot be delegated to a private corporation which is not under governmental control or regulation, and make this the test of "public use." But generally speaking, there have been two general views of what constitutes a public use, and under one head or the other most of the authorities are ranged: one, holding that there must be a use or right of use on the part of the public or some limited portion of it; the other, holding that public use is equivalent to public benefit or utility. 1 Lewis on Eminent Domain (3d Ed.) § 257. These two views are the only ones we

need consider. Nichols on Eminent Domain, § 206, note, says: "The weight of authority supports this view" (the second). An examination of the authorities tends to support this conclusion. There are a host of decisions supporting each view; it is quite immaterial which has the major number. We, from the beginning, have adopted the second view, and, unless there be good reason, we should not now depart from it. When first called upon to consider a grant to a railroad of the right of eminent domain, we adopted the public utility view as the test of "public use." *Bradley* v. *New York & N. H. R. Co.*, 21 Conn. 294, 305. In *Olmstead* v. *Camp*, 33 Conn. 532, in sustaining the constitutionality of the grant to a grist-mill of the right to flow land, the question, which of these conflicting views should prevail, was elaborately and ably presented by the most eminent lawyers of that day. Judge Origen S. Seymour, for the respondent, maintained (p. 539) that "no taking . . . is for public use unless the property is to be *used by the public* . . . to answer some public exigency, and must be appropriated for that service. . . . Public use means possession, occupation, direct enjoyment by the public. The thing taken is used by the public, and is taken that it may be so used." The court considered and repudiated view one, that "public use means possession, occupation, direct enjoyment by the public." "Public use," says McCurdy, J., "may therefore well mean public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the State under its right of eminent domain for purposes of great advantage to the community, is a taking for public use. . . . The term 'public use' is synonymous with public benefit or advantage." Six months later the court, in *Todd* v. *Austin*, 34 Conn. 78, had before it the same question, and it said that this point "was decided

after full consideration in the case of *Olmstead* v. *Camp*." In *Bradley* v. *New York & N. H. R. Co.*, 21 Conn. 294, the power of eminent domain given the railroad was sustained upon the ground of the public benefit to be subserved. This case and *Nicholson* v. *New York & N. H. R. Co.*, 22 Conn. 74, were cited in *Olmstead* v. *Camp*, in support of its holding that public utility was the test of public use. In *New York, N. H. & H. R. Co.* v. *Offield*, 77 Conn. 417, 421, 59 Atl. 510, we said, BALDWIN, J.: "It [property taken by eminent domain for a railroad] is so taken because the public benefit will be promoted by such a railroad." So in *Evergreen Cemetery Asso.* v. *Beecher*, 53 Conn. 551, 553, 5 Atl. 353, we said, PARDEE, J.: "Corporations take land by right of eminent domain primarily for the benefit of the public, incidentally for the benefit of themselves." And in the latest utterance of this court upon this subject we have held to the same underlying principle. *Water Commissioners* v. *Johnson*, 86 Conn. 151, 164, 84 Atl. 727.

All authorities place Connecticut among the courts committed to the utility test. It has behind it the authority of our greatest jurists, such as CHIEF JUSTICES STORRS, BUTLER, and BALDWIN. Before we overrule so settled a principle of law, it ought to be very apparent that it does not rest upon a logical basis, or that in its practical operation it either has worked injustice or promises to.

The utility test is not subject to such attack. It rests on the better reasoning, and in its application it has not worked harm. Every valid exercise of this right in all jurisdictions can be supported upon this underlying principle of public utility. The instances which the opinion holds to be exceptions to its test of employment, viz., Acts giving the right of eminent domain in aid of mills, mining, drainage, and irriga-

tion, have been and can be justified by the public good to the locality of its exercise.

It is objected that the utility test leaves it open to the legislature to determine, in each instance, what is for the public welfare, and thus private property is liable to be stripped of its necessary safeguard. We must recognize, as most do, that public use is an elastic term, varying with different ages, and different circumstances, and different localities. "The term 'public use' is flexible, and cannot be confined to public use known at the time of framing the constitution. All improvements that may be made, if useful to the public, may be encouraged by the exercise of eminent domain. Any use . . . which will satisfy a reasonable public demand for facilities of travel, for transmission of intelligence or of commodities, would be a public use." *Trenton & N. B. Turnpike Co.* v. *American & E. C. News Co.*, 43 N. J. L. 381, 384. What have been recognized as public uses are not conclusive of what may at a later time be recognized as such by a legislature. Were this not true, this right could not have been given each new public utility. What is a public use in a given case depends upon the surrounding facts; it is a question of degree and kind. A new public use must first secure legislative approval, and, if questioned, the sanction of the courts. Unless it clearly appears that public utility will not be subserved, the court will uphold the legislative declaration. The scope and limitations of this test were pointed out by McCurdy, J., in *Olmstead* v. *Camp*, 33 Conn. 532, 551: "The power requires a degree of elasticity to be capable of meeting new conditions and improvements and the ever increasing necessities of society. The sole dependence must be on the presumed wisdom of the sovereign authority, supervised, and in cases of gross error or extreme wrong, controlled, by the dispassionate judg-

ment of the courts." So controlled, there can be no danger to private ownership. In the end the courts decide whether the public benefit is great enough to warrant the exercise of this power in the given case. When my brethren apply, as one test of public use, that the use must be for or in the nature of a governmental purpose, the only tribunal which can finally decide whether the given instance is a governmental purpose or not is the court. If there be no danger in the court deciding this, there can be none to its deciding that the public welfare is great enough to make the instance a public use.

The employment test puts the doctrine of public use in a straight-jacket, and, unless the court finds the use to be open to the public, it must automatically deny the power. If this test be strictly applied, many instances where the right of eminent domain has been exercised will fall outside. To escape this difficulty, my brethren assert that there is a class of exceptions which, though clearly not open to the public, are upheld as instances of the development of the natural resources of the State. Under this head they place Acts in aid of mills, mining, navigation, drainage, and the development of water-power. A reference to these cases will show that they were supported by reason of the great public good subserved. The cases of *Olmstead* v. *Camp*, 33 Conn. 532, and *Todd* v. *Austin*, 34 Conn. 78, upholding mill Acts, do not recognize such an exception. The very fact that so many cases of recognized public use fall without the employment test discredit it.

On the other hand, the utility test will meet every instance in the future where changing conditions make the declaration of a new public use necessary for the public good. The question for the court will be, is this new use of so great a public benefit that it cannot be

Connecticut College *v.* Calvert.

said to be wholly private, but must be held to be for the public use? All private property should be available whenever its use will be of great public benefit. The right so to take is "vital to the public welfare of every self-governing community." If the right of the public to use the land taken be the test, all forms of private activities, such as theatres, hotels, and the like, would meet the test, and the court must so hold. Whereas, under the public welfare test, all of these private activities would be held to serve private interests, and the public benefit would be but an incident of the private ownership. And instances might occur in which the public were given the use of land taken for a private business for which the public had no use. So the grant would be held to serve a public use when the public received no benefit from it.

When we say the public benefit is the underlying principle by which to test the public use, we do not mean that in all cases where the taking may be of public benefit private property may be taken. It can be taken only when the public benefit is so great as to make the taking a public use. Each case stands, as we have pointed out, on its own facts.

The legislative declaration of a public use is subject to the supervision of the courts in case the use be palpably without reasonable foundation. The courts will exercise control only in cases of palpable abuse. This is the doctrine of the United States Supreme Court as last announced. *Clark* v. *Nash*, 189 U. S. 361, 25 Sup. Ct. Rep. 676. This case is, of course, in conflict with *Brown* v. *Gerald*, 100 Me. 351, 61 Atl. 785, on which the opinion relies. Originally it was thought, and the argument of the opinion seems in accord, that this right could not reach beyond material ends; this is no longer the general view. In *United States* v. *Gettysburg Electric Ry. Co.*, 160 U. S. 668, 16 Sup. Ct. Rep.

427, this right was upheld when invoked in aid of a patriotic public aim—the preservation of an historic battlefield. In its holding that the power of eminent domain, "it is universally agreed, depends upon the common and equal right of the public to the benefit of the service rendered, free from unreasonable discrimination," I think the opinion is in error in failing to note the conflict of the authorities between the utility and the employment view. Ordinarily, in jurisdictions upholding the utility view, it would be clear, where the public had no right to use the land taken, that private interest alone was served, and no basis would be present for holding the public benefit so great as to make it a public use. But instances occur where the public have not the right of service, as in the Acts in aid of mills, mining, and irrigation, where the right of eminent domain is upheld, and the immediate benefit is to private ownership alone. The resultant benefit to the public through the private enterprise is the foundation of the grant. Generally speaking, these have been confined to purposes giving the public material benefits. No good reason can be suggested why purposes which benefit the body and mind of citizens, or which educate, uplift, and ennoble a community, should not be esteemed of as great public good as the things which add directly to its wealth or give employment to its citizens. The development and encouragement of the things of the spirit are more enduringly vital to the State than the development of its material resources. The value to a State of a great educational institution for the higher education of women cannot be measured. No institution has done as much for the strength and fame of our State and for the lives of its people as Yale. Yet Yale, so far as its charter goes, is a private institution, as much so as the Connecticut College for Women. Does it appeal to the common-sense of the average

man that it is justifiable to give a private mill the right to flow another's land, an electric light company the right to take land by eminent domain, an individual the right to flow another's land in order to irrigate his own arid land, or to carry a water-supply across another's land in order to conduct his mine, or to drain another's land in order to cultivate his own, and deny a corresponding right to a college for the higher education of women to take land for its site, when it is ready to begin its noble charity with resources at its inception greater than most of our New England colleges had years after their foundation?

The opinion relies greatly upon *Evergreen Cemetery Asso.* v. *Beecher*, 53 Conn. 551. I do not think it upholds the employment view of public use; on the contrary, I think it reasserts the utility view of *Olmstead* v. *Camp*, 33 Conn. 532. And it holds that a taking for a private cemetery, in which the public have not and cannot acquire the right to bury, was not for the benefit of the public. The case was a clear one. There was no great public good to be served by giving to this private cemetery the right of eminent domain. The fact that the public could not use the cemetery helped to indicate that the use of the land to be taken was private and not public; but the case does not, nor was it intended to, establish a general rule of law making any and all grants of such a right to private cemeteries for all time not for a public use. No automatic rule for so elastic a subject as public use will do. The public utility view would leave each case to be measured by its facts in its day and location and in the light of the service to be rendered. In the definitions of those who prefer the employment view, we find the promotion of the general welfare is made the foundation principle of eminent domain. 1 Lewis on Eminent Domain (3d Ed.) § 1, p. 1; Cooley on Constitutional Limita-

tions (7th Ed.) p. 754.  Eminent domain is the right of the sovereign to appropriate private property (directly or by delegation) for the public benefit or welfare. The right is justified only when the grant is for the public welfare.  It never should be disassociated from the public benefit.

The opinion holds that a grant of eminent domain to a private collegiate institution cannot be sustained unless the education furnished be for the public on equal terms.

My own conclusion is that the State can make such grant provided it be one for the public use; that whether it be for the public use or not depends upon the extent of the public welfare to be subserved; and when, in a given case, the public good to be served is large enough, the grant may be made, even though it be in the power of the trustees of the institution to administer it so that its benefits may not be open to the public on equal terms.  Ordinarily this limitation would mark the grant as serving a private use; but the situation surrounding the grant may be so exceptional as to make the public good loom large enough to constitute the grant one for a public use.  In this case the character of the Connecticut College for Women, a charity maintained at private cost and without profit, serving a great public need, and relieving the State from a duty which it might well assume, renders it impossible for the court of its own knowledge to say that the resultant public welfare is not so great as to make of it a public use as the General Assembly declared it to be.

I think the court cannot hold it to be clear beyond a reasonable doubt that the purpose of the Act is not a public use, and hence that the Act is unconstitutional.

Were this rule of construction generally followed, the instances where legislative Acts were held unconstitutional would be comparatively few, and criticism

of the judiciary for its invasion of the legislative field would be seldom heard. The State will be stronger the better the judiciary maintains the balance between the departments of government.

In my opinion, the demurrer should be overruled.